SMITH ET AL. *v.* ROBINSON, RHODE ISLAND ASSOCI-
ATE COMMISSIONER OF EDUCATION, ET AL.

No. 82–2120.   Argued March 28, 1984—Decided July 5, 1984

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, *post*, p. 1021.

*E. Richard Larson* argued the cause for petitioners. With him on the briefs were *Burt Neuborne, Charles S. Sims,* and *Ivan E. Bodensteiner.*

*Forrest L. Avila* argued the cause and filed a brief for respondents.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents questions regarding the award of attorney's fees in a proceeding to secure a "free appropriate public education" for a handicapped child. At various stages in the proceeding, petitioners asserted claims for relief based on state law, on the Education of the Handicapped Act (EHA), 84 Stat. 175, as amended, 20 U. S. C. § 1400 *et seq.*, on § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794, and on the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. The United States Court of Appeals

---

*Briefs of *amici curiae* urging reversal were filed for the Association for Children and Adults with Learning Disabilities by *Matthew B. Bogin;* and for the Association for Retarded Citizens of the United States et al. by *Leonard Rieser.*

*Inez Smith Reid,* Corporation Cousel, *John H. Suda,* Principal Deputy Corporation Counsel, *Charles L. Reischel,* Deputy Corporation Counsel, and *Richard B. Nettler,* Assistant Corporation Counsel, filed a brief for the District of Columbia as *amicus curiae* urging affirmance.

*Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon* filed a brief for the National School Boards Association as *amicus curiae.*

for the First Circuit concluded that because the proceeding, in essence, was one to enforce the provisions of the EHA, a statute that does not provide for the payment of attorney's fees, petitioners were not entitled to such fees. *Smith* v. *Cumberland School Committee*, 703 F. 2d 4 (1983). Petitioners insist that this Court's decision in *Maher* v. *Gagne*, 448 U. S. 122 (1980), compels a different conclusion.

## I

The procedural history of the case is complicated, but it is significant to the resolution of the issues. Petitioner Thomas F. Smith III (Tommy), suffers from cerebral palsy and a variety of physical and emotional handicaps. When this proceeding began in November 1976, Tommy was eight years old. In the preceding December, the Cumberland School Committee had agreed to place Tommy in a day program at Emma Pendleton Bradley Hospital in East Providence, R. I., and Tommy began attending that program. In November 1976, however, the Superintendent of Schools informed Tommy's parents, who are the other petitioners here, that the School Committee no longer would fund Tommy's placement because, as it construed Rhode Island law, the responsibility for educating an emotionally disturbed child lay with the State's Division of Mental Health, Retardation and Hospitals (MHRH). App. 25–26.

Petitioners took an appeal from the decision of the Superintendent to the School Committee. In addition, petitioners filed a complaint under 42 U. S. C. § 1983 in the United States District Court for the District of Rhode Island against the members of the School Committee, asserting that due process required that the Committee comply with "Article IX—Procedural Safeguards" of the Regulations adopted by the State Board of Regents regarding Education of Handicapped Children (Regulations)[1] and that Tommy's placement

---

[1] In November 1976, Rhode Island, through its Board of Regents for Education, was in the process of promulgating new regulations concerning

in his program be continued pending appeal of the Superintendent's decision.

In orders issued in December 1976 and January 1977, the District Court entered a temporary restraining order and then a preliminary injunction. The court agreed with petitioners that the Regulations required the School Committee to continue Tommy in his placement at Bradley Hospital pending appeal of the Superintendent's decision. The School Committee's failure to follow the Regulations, the court concluded, would constitute a deprivation of due process.

On May 10, 1978, petitioners filed a first amended complaint. App. 49. By that time, petitioners had completed the state administrative process. They had appealed the Superintendent's decision to the School Committee and then to the State Commissioner of Education, who delegated responsibility for conducting a hearing to an Associate Commissioner of Education. Petitioners had moved that the Associate Commissioner recuse himself from conducting the review of the School Committee's decision, since he was an employee of the state education agency and therefore not an impartial hearing officer. The Associate Commissioner denied the motion to recuse.

---

the education of handicapped children. The old regulations, approved in 1963, had been issued by the State Department of Education and were entitled "Regulations—Education of Handicapped Children." Most of the new Regulations became effective October 1, 1977. Article IX of Section One, however, was made effective June 14, 1976. See Section One, Art. XII.

The Regulations were promulgated pursuant to R. I. Gen. Laws § 16–24–2 (1981). The immediately preceding section, § 16–24–1, sets out the duty of the local school committee to provide for a child, "who is either mentally retarded or physically or emotionally handicapped to such an extent that normal educational growth and development is prevented," such type of special education "that will best satisfy the needs of the handicapped child, as recommended and approved by the state board of regents for education in accordance with its regulations." Section 16–24–1 has its origin in 1952 R. I. Pub. Laws, ch. 2905, § 1, and was in effect in November 1976.

All the state officers agreed that, under R. I. Gen. Laws, Tit. 40, ch. 7 (1977), the responsibility for educating Tommy lay with MHRH.[2] The Associate Commissioner acknowledged petitioners' argument that since § 40.1–7–8 would require them to pay a portion of the cost of services provided to Tommy,[3] the statute conflicted with the EHA, but concluded that the problem was not within his jurisdiction to resolve.

In their first amended complaint, petitioners added as defendants the Commissioner of Education, the Associate Commissioner of Education, the Board of Regents for Education, and the Director of MHRH. They also specifically relied for the first time on the EHA, noting that at all times mentioned in the complaint, the State of Rhode Island had submitted a plan for state-administered programs of special education and related services and had received federal funds pursuant to the EHA.[4]

---

[2] Under § 40.1–7–3, enacted by 1971 R. I. Pub. Laws, ch. 89, art. 1, § 1, MHRH is charged "with the responsibility to promote the development of specialized services for the care and treatment of emotionally disturbed children and to cooperate to this end with all reputable agencies of a public or private character serving such children . . . ."

[3] Section 40.1–7–8 provides: "The parents of children in the program, depending upon their resources, shall be obligated to participate in the costs of the care and treatment of their children in accordance with regulations to be promulgated by the director."

[4] The 1975 amendment to the EHA, on which petitioners rely, became effective October 1, 1977. Prior to that date, the federal requirements governing States which, like Rhode Island, submitted state plans and received federal money for the education of handicapped children were found in the EHA, 84 Stat. 175, as amended in 1974, 88 Stat. 579. The obligations imposed on a State by that Act were to expend federal money on programs designed to benefit handicapped children. From August 1974 to September 30, 1977, the Act also required that parents be given minimal due process protections when the State proposed to change the educational placement of the child. 88 Stat. 582. The state hearing process in this case began on January 20, 1977, with a hearing before the School Committee. By the time petitioners' appeal progressed to the Associate Commissioner of Education on November 2, 1977, the 1975

In the first count of their amended complaint, petitioners challenged the fact that both the hearing before the School Committee and the hearing before the Associate Commissioner were conducted before examiners who were employees of the local or state education agency. They sought a declaratory judgment that the procedural safeguards contained in Article IX of the Regulations did not comply with the Due Process Clause of the Fourteenth Amendment or with the requirements of the EHA, 20 U. S. C. § 1415, and its accompanying regulations. They also sought an injunction prohibiting the Commissioner and Associate Commissioner from conducting any more hearings in review of decisions of the Rhode Island local education agencies (LEA's) unless and until the Board of Regents adopted regulations that conformed to the requirements of § 1415 and its regulations. Finally, they sought reasonable attorney's fees and costs.

In the second count of their amended complaint, petitioners challenged the substance of the Associate Commissioner's decision. In their view, the decision violated Tommy's rights "under federal and state law to have his LEA provide a free, appropriate educational placement without regard to whether or not said placement can be made within the local school system." App. 61. They sought both a declaratory judgment that the School Committee, not MHRH, was responsible for providing Tommy a free appropriate education, and an injunction requiring the School Committee to provide Tommy such an education. They also asked for reasonable attorney's fees and costs.

On December 22, 1978, the District Court issued an opinion acknowledging confusion over whether, as a matter of state law, the School Committee or MHRH was responsible for funding and providing the necessary services for Tommy. *Id.*, at 108. The court also noted that if the Associate

Act was in effect. Unless otherwise indicated, future references to the "EHA" refer to the 1975 amendments to that Act.

Commissioner were correct that Tommy's education was governed by § 40.1–7, the state scheme would appear to be in conflict with the requirements of the EHA, since § 40.1–7 may require parental contribution and may not require MHRH to provide education at all if it would cause the Department to incur a deficit. At the request of the state defendants, the District Court certified to the Supreme Court of Rhode Island the state-law questions whether the School Committee was required to provide special education for a resident handicapped student if the local educational programs were inadequate, and whether the cost of such programs was the responsibility of the local School Committee or of the MHRH.

On May 29, 1979, the District Court granted partial summary judgment for the defendants on petitioners' claim that they were denied due process by the requirement of the Regulations that they submit their dispute to the School Committee and by the Associate State Commissioner's refusal to recuse himself. The court noted that the School Committee's members were not "employees" of the local education agency, but elected officials, and determined that the provision of the EHA directing that no hearing shall be conducted by an employee of an agency or unit involved in the education or care of the child does not apply to hearings conducted by the state education agency.

On June 3, 1980, the Rhode Island Supreme Court issued an opinion answering the certified questions. *Smith* v. *Cumberland School Committee*, 415 A. 2d 168. Noting the responsibility of the Board of Regents for Education to comply with the requirements of the EHA, the court determined that the primary obligation of financing a handicapped child's special education lay with the local School Committee. Whatever obligation § 40.1–7 imposes on MHRH to provide educational services is limited and complements, rather than supplants, the obligations of School Committees under § 16.24–1.

Petitioners thereafter filed their second amended and supplemental complaint. App. 152. In it they added to Count II claims for relief under the Equal Protection Clause of the Fourteenth Amendment and under § 504 of the Rehabilitation Act of 1973, as amended, 29 U. S. C. § 794. They also requested attorney's fees under 42 U. S. C. § 1988 and what was then 31 U. S. C. § 1244(e) (1976 ed.).[5]

On January 12, 1981, the District Court issued an order declaring petitioners' rights, entering a permanent injunction against the School Committee defendants, and approving an award of attorney's fees against those defendants. App. 172. The court ordered the School Committee to pay the full cost of Tommy's attendance at Harmony Hill School, Tommy's then-current placement. By agreement between petitioners and the School Committee and without prejudice to petitioners' claims against the other defendants, the court awarded attorney's fees in the amount of $8,000, pursuant to 42 U. S. C. § 1988 and the then 31 U. S. C. § 1244 (e) (1976 ed.).

On June 4, 1981, the District Court issued two orders, this time addressed to petitioners' claims against the state defendants. In the first order, App. 177, the court denied the state defendants' motion to dismiss. In the second order, *id.*, at 189, the court declared that Tommy is entitled to a

---

[5] By the time of the filing of petitioners' second amended and supplemental complaint on September 16, 1980, attorney's fees were available directly under the Rehabilitation Act. See Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, § 120, 92 Stat. 2982, 29 U. S. C. § 794a. Instead of relying on that statute, however, petitioners relied on 31 U. S. C. § 1244(e) (1976 ed.) (now replaced by 31 U. S. C. § 6721(c)(2)), a statute that authorized a civil action to enforce § 504 of the Rehabilitation Act against any State or local government receiving federal funds under the State and Local Fiscal Assistance Act of 1972, 86 Stat. 919, as amended by the State and Local Fiscal Assistance Amendments of 1976, 90 Stat. 2341. Section 1244(e) authorized an award of attorney's fees to a "prevailing party."

free appropriate special education paid for by the Cumberland School Committee. The court noted that since Tommy was entitled to the relief he sought as a matter of state law, it was unnecessary and improper for the court to go further and reach petitioners' federal statutory and constitutional claims. Petitioners were given 14 days to move for an award of fees.

The Court of Appeals for the First Circuit affirmed in an unpublished *per curiam* opinion filed on January 11, 1982. It concluded that the Commissioner was not immune from injunctive relief and that petitioners' challenge to the District Court's award of summary judgment to respondents on their due process challenge was moot.

Petitioners requested fees and costs against the state defendants. *Id.*, at 195. On April 30, 1982, the District Court ruled orally that petitioners were entitled to fees and costs in the amount of $32,109 for the hours spent in the state administrative process both before and after the state defendants were named as parties to the federal litigation. App. to Pet. for Cert. A31–A58. Relying on *New York Gaslight Club, Inc.* v. *Carey*, 447 U. S. 54 (1980), and its own opinion in *Turillo* v. *Tyson*, 535 F. Supp. 577 (1982), the court reasoned that because petitioners were required to exhaust their EHA remedies before bringing their § 1983 and § 504 claims, they were entitled to fees for those procedures. The court agreed with respondents that petitioners were not entitled to compensation for hours spent challenging the use of employees as hearing officers. No fees were awarded for hours spent obtaining the preliminary injunctive relief, as petitioners already had been compensated for that work by the School Committee defendants. Finally, the court rejected the defendants' argument that fees should not be allowed because this was an action under the EHA, which does not provide for fees. In the court's view, respondents had given insufficient weight to the fact that petitioners had alleged equal protection and § 1983 claims as well as the EHA claim. The court

added that it found the equal protection claim petitioners included in their second amended complaint to be colorable and nonfrivolous. Petitioners thus were entitled to fees for prevailing in an action to enforce their § 1983 claim.

The Court of Appeals reversed. *Smith* v. *Cumberland School Committee*, 703 F. 2d 4 (CA1 1983). The court first noted that, under what is labeled the "American Rule," attorney's fees are available as a general matter only when statutory authority so provides. *Alyeska Pipeline Co.* v. *Wilderness Society*, 421 U. S. 240 (1975). Here the action and relief granted in this case fell within the reach of the EHA, a federal statute that establishes a comprehensive federal-state scheme for the provision of special education to handicapped children, but that does not provide for attorney's fees.[6] For fees, the District Court had to look to § 1988 and § 505 of the Rehabilitation Act.

As to the § 1988 claim, the court acknowledged the general rule that when the claim upon which a plaintiff actually prevails is accompanied by a "substantial," though undecided, § 1983 claim arising from the same nucleus of facts, a fee award is appropriate. *Maher* v. *Gagne*, 448 U. S., at 130–131. Here, petitioners' § 1983 claims arguably were at least substantial enough to support federal jurisdiction. *Ibid.* Even if the § 1983 claims were substantial, however,

---

[6] The District Court purported to award relief on the basis of state law. In light of the decision in *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984), that was improper. The propriety of the injunctive relief, however, is not at issue here. We think the Court of Appeals was correct in treating the relief as essentially awarded under the EHA, since petitioners had challenged the State Commissioner's construction of state law on the basis of their rights under the EHA, and since the question of state law on which petitioners prevailed was certified by the District Court in an effort to avoid a Supremacy Clause conflict with the EHA. It is clear that the EHA creates a right, enforceable in federal court, to the free appropriate public education required by the statute. *Board of Education of Hendrick Hudson Central School Dist.* v. *Rowley*, 458 U. S. 176 (1982); 20 U. S. C. § 1415(e)(2).

the Court of Appeals concluded that, given the comprehensiveness of the EHA, Congress could not have intended its omission of attorney's fees relief to be rectified by recourse to § 1988.

The Court of Appeals drew support for its conclusion from this Court's decision in *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981). There the Court held that where Congress had provided comprehensive enforcement mechanisms for protection of a federal right and those mechanisms did not include a private right of action, a litigant could not obtain a private right of action by asserting his claim under § 1983. The Court of Appeals recognized that *Sea Clammers* might not logically preclude a § 1983 action for violation of the EHA, since the EHA expressly recognizes a private right of action, but it does support the more general proposition that when a statute creates a comprehensive remedial scheme, intentional "omissions" from that scheme should not be supplanted by the remedial apparatus of § 1983. In the view of the Court of Appeals, the fact that the § 1983 claims alleged here were based on independent constitutional violations rather than violations of the EHA was immaterial. The constitutional claims alleged—a denial of due process and a denial of a free appropriate public education because of handicap— are factually identical to the EHA claims. If a litigant could obtain fees simply by an incantation of § 1983, fees would become available in almost every case.[7]

---

[7]The Court of Appeals added that it did not intend to indicate that the EHA in any way limits the scope of a handicapped child's constitutional rights. Claims not covered by the EHA should still be cognizable under § 1983, with fees available for such actions. The court noted, for instance, that to the extent petitioners' securing of a preliminary injunction fell outside any relief available under the EHA, attorney's fees might be appropriate for that relief. Because the award of fees against the School Committee for work done in obtaining the preliminary injunction was not challenged on appeal, the court had no occasion to decide the issue.

The court disposed of the Rehabilitation Act basis for fees in a similar fashion. Even if Congress did not specifically intend to pre-empt § 504 claims with the EHA, the EHA's comprehensive remedial scheme entails a rejection of fee-shifting that properly limits the fees provision of the more general Rehabilitation Act.

Because of confusion in the Courts of Appeals over the proper interplay among the various statutory and constitutional bases for relief in cases of this nature, and over the effect of that interplay on the provision of attorney's fees,[8] we granted certiorari, 464 U. S. 932 (1983).

## II

Petitioners insist that the Court of Appeals simply ignored the guidance of this Court in *Maher* v. *Gagne, supra,* that a prevailing party who asserts substantial but unaddressed constitutional claims is entitled to attorney's fees under 42 U. S. C. § 1988. They urge that the reliance of the Court of Appeals on *Sea Clammers* was misplaced. *Sea Clammers* had to do only with an effort to enlarge a statutory remedy by asserting a claim based on that statute under the "and laws" provision of § 1983.[9] In this case, petitioners made no

---

[8] See, *e. g., Quackenbush* v. *Johnson City School District,* 716 F. 2d 141 (CA2 1983) (§ 1983 remedy, including damages, available for claim that plaintiff was denied access to EHA procedures); *Department of Education of Hawaii* v. *Katherine D.,* 727 F. 2d 809 (CA9 1983) (EHA precludes reliance on § 1983 or § 504); *Robert M.* v. *Benton,* 671 F. 2d 1104 (CA8 1982) (fees available under § 1988 because plaintiff made colorable due process as well as EHA challenges to use of state agency employee as hearing officer); *Hymes* v. *Harnett County Board of Education,* 664 F. 2d 410 (CA4 1981) (claims made under the EHA, § 504, and § 1983; fees available for due process relief not available under the EHA); *Anderson* v. *Thompson,* 658 F. 2d 1205 (CA7 1981) (EHA claim not assertable under § 1983; attorney's fees therefore not available).

[9] Title 42 U. S. C. § 1983 provides a remedy for a deprivation, under color of state law, "of any rights, privileges, or immunities secured by the Constitution *and laws*" (emphasis added). In *Maine* v. *Thiboutot,* 448 U. S. 1 (1980), the Court held that § 1983 authorizes suits to redress viola-

effort to enlarge the remedies available under the EHA by asserting their claim through the "and laws" provision of § 1983. They presented separate constitutional claims, properly cognizable under § 1983. Since the claim on which they prevailed and their constitutional claims arose out of a "'"common nucleus of operative fact,"'" *Maher* v. *Gagne,* 448 U. S., at 133, n. 15, quoting H. R. Rep. No. 94–1558, p. 4, n. 7 (1976), in turn quoting *Mine Workers* v. *Gibbs,* 383 U. S. 715, 725 (1966), and since the constitutional claims were found by the District Court and assumed by the Court of Appeals to be substantial, petitioners urge that they are entitled to fees under § 1988. In addition, petitioners presented a substantial claim under § 504 of the Rehabilitation Act. Since § 505 of that Act authorizes attorney's fees in the same manner as does § 1988 and in fact incorporates the legislative history of § 1988, see 124 Cong. Rec. 30346 (1978) (remarks of Sen. Cranston), the reasoning of *Maher* applies to claims based on § 504. Petitioners therefore, it is claimed, are entitled to fees for substantial, though unaddressed, § 504 claims.

Respondents counter that petitioners simply are attempting to circumvent the lack of a provision for attorney's fees in the EHA by resorting to the pleading trick of adding surplus constitutional claims and similar claims under § 504 of the Rehabilitation Act. Whatever Congress' intent was in authorizing fees for substantial, unaddressed claims based on § 1988 or § 505, it could not have been to allow plaintiffs to receive an award of attorney's fees in a situation where Congress has made clear its intent that fees not be available.

Resolution of this dispute requires us to explore congressional intent, both in authorizing fees for substantial un-

---

tions by state officials of rights created by federal statutes as well as by the Federal Constitution and that fees are available under § 1988 for such statutory violations.

  *Sea Clammers* excluded from the reach of *Thiboutot* cases in which Congress specifically foreclosed a remedy under § 1983. 453 U. S., at 19.

addressed constitutional claims and in setting out the elaborate substantive and procedural requirements of the EHA, with no indication that attorney's fees are available in an action to enforce those requirements. We turn first to petitioners' claim that they were entitled to fees under 42 U. S. C. § 1988 because they asserted substantial constitutional claims.

## III

As the legislative history illustrates and as this Court has recognized, § 1988 is a broad grant of authority to courts to award attorney's fees to plaintiffs seeking to vindicate federal constitutional and statutory rights. *Maine* v. *Thiboutot*, 448 U. S. 1, 9 (1980); *Maher* v. *Gagne, supra; Hutto* v. *Finney*, 437 U. S. 678, 694 (1978); S. Rep. No. 94–1011, p. 4 (1976) (a prevailing plaintiff " 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust,' " quoting *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402 (1968)). Congress did not intend to have that authority extinguished by the fact that the case was settled or resolved on a nonconstitutional ground. *Maher* v. *Gagne*, 448 U. S., at 132. As the Court also has recognized, however, the authority to award fees in a case where the plaintiff prevails on substantial constitutional claims is not without qualification. Due regard must be paid, not only to the fact that a plaintiff "prevailed," but also to the relationship between the claims on which effort was expended and the ultimate relief obtained. *Hensley* v. *Eckerhart*, 461 U. S. 424 (1983); *Blum* v. *Stenson*, 465 U. S. 886 (1984). Thus, for example, fees are not properly awarded for work done on a claim on which a plaintiff did not prevail and which involved distinctly different facts and legal theories from the claims on the basis of which relief was awarded. *Hensley* v. *Eckerhart*, 461 U. S., at 434–435, 440. Although, in most cases, there is no clear line between hours of work that contributed to a plaintiff's success and those that did not, district courts remain charged with the responsibility, imposed by Congress, of evaluating the award requested

in light of the relationship between particular claims for which work is done and the plaintiff's success. *Id.*, at 436–437.

A similar analysis is appropriate in a case like this, where the prevailing plaintiffs rely on substantial, unaddressed constitutional claims as the basis for an award of attorney's fees. The fact that constitutional claims are made does not render automatic an award of fees for the entire proceeding. Congress' purpose in authorizing a fee award for an unaddressed constitutional claim was to avoid penalizing a litigant for the fact that courts are properly reluctant to resolve constitutional questions if a nonconstitutional claim is dispositive. H. R. Rep. No. 94–1558, at 4, n. 7. That purpose does not alter the requirement that a claim for which fees are awarded be reasonably related to the plaintiff's ultimate success. It simply authorizes a district court to assume that the plaintiff has prevailed on his fee-generating claim and to award fees appropriate to that success.[10]

In light of the requirement that a claim for which fees are awarded be reasonably related to the plaintiff's ultimate success, it is clear that plaintiffs may not rely simply on the fact that substantial fee-generating claims were made during the course of the litigation. Closer examination of the nature of the claims and the relationship between those claims and petitioners' ultimate success is required.

Besides making a claim under the EHA, petitioners asserted at two different points in the proceedings that procedures employed by state officials denied them due process. They also claimed that Tommy was being discriminated against on the basis of his handicapping condition, in viola-

---

[10] The legislative history also makes clear that the fact that a plaintiff has prevailed on one of two or more alternative bases for relief does not prevent an award of fees for the unaddressed claims, as long as those claims are reasonably related to the plaintiff's ultimate success. See S. Rep. No. 94–1011, p. 6 (1976), citing *Davis* v. *County of Los Angeles*, 8 EPD ¶ 9444 (CD Cal. 1974). See also *Hensley* v. *Eckerhart*, 461 U. S. 424, 435 (1983). The same rule should apply when an unaddressed constitutional claim provides an alternative, but reasonably related, basis for the plaintiff's ultimate relief.

1008

tion of the Equal Protection Clause of the Fourteenth Amendment.

A

The first due process claim may be disposed of briefly. Petitioners challenged the refusal of the School Committee to grant them a full hearing before terminating Tommy's funding. Petitioners were awarded fees against the School Committee for their efforts in obtaining an injunction to prevent that due process deprivation. The award was not challenged on appeal and we therefore assume that it was proper.

The fact that petitioners prevailed on their initial due process claim, however, by itself does not entitle them to fees for the subsequent administrative and judicial proceedings. The due process claim that entitled petitioners to an order maintaining Tommy's placement throughout the course of the subsequent proceedings is entirely separate from the claims petitioners made in those proceedings. Nor were those proceedings necessitated by the School Committee's failings. Even if the School Committee had complied with state regulations and had guaranteed Tommy's continued placement pending administrative review of its decision, petitioners still would have had to avail themselves of the administrative process in order to obtain the permanent relief they wanted—an interpretation of state law that placed on the School Committee the obligation to pay for Tommy's education. Petitioners' initial due process claim is not sufficiently related to their ultimate success to support an award of fees for the entire proceeding. We turn, therefore, to petitioners' other § 1983 claims.

As petitioners emphasize, their § 1983 claims were not based on alleged violations of the EHA,[11] but on independent

---

[11] Courts generally agree that the EHA may not be claimed as the basis for a § 1983 action. See, *e. g., Quackenbush* v. *Johnson City School District*, 716 F. 2d 141 (CA2 1983); *Department of Education of Hawaii* v. *Katherine D.*, 727 F. 2d 809 (CA9 1983); *Anderson* v. *Thompson*, 658 F. 2d 1205 (CA7 1981).

claims of constitutional deprivations. As the Court of Appeals recognized, however, petitioners' constitutional claims, a denial of due process and a denial of a free appropriate public education as guaranteed by the Equal Protection Clause, are virtually identical to their EHA claims.[12] The question to be asked, therefore, is whether Congress intended that the EHA be the exclusive avenue through which a plaintiff may assert those claims.

## B

We have little difficulty concluding that Congress intended the EHA to be the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education. The EHA is a comprehensive scheme set up by Congress to aid the States in complying with their constitutional obligations to provide public education for handicapped children. Both the provisions of the statute and its legislative history indicate that Congress intended handicapped children with constitutional claims to a free appropriate public education to pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute.

In the statement of findings with which the EHA begins, Congress noted that there were more than 8 million handicapped children in the country, the special education needs of most of whom were not being fully met. 20 U. S. C.

---

[12] The timing of the filing of petitioners' second amended complaint, after the Supreme Court of Rhode Island had ruled that petitioners were entitled to the relief they sought, reveals that the equal protection claim added nothing to petitioners' claims under the EHA and provides an alternative basis for denying attorney's fees on the basis of that claim. There is, of course, nothing wrong with seeking relief on the basis of certain statutes because those statutes provide for attorney's fees, or with amending a complaint to include claims that provide for attorney's fees. But where it is clear that the claims that provide for attorney's fees had nothing to do with a plaintiff's success, *Hensley* v. *Eckerhart, supra,* requires that fees not be awarded on the basis of those claims.

§§ 1400(b)(1), (2), and (3).   Congress also recognized that in a series of "landmark court cases," the right to an equal education opportunity for handicapped children had been established.   S. Rep. No. 94–168, p. 6 (1975).   See also *id.*, at 13 ("It is the intent of the Committee to establish and protect the right to education for all handicapped children and to provide assistance to the States in carrying out their responsibilities under State law and the Constitution of the United States to provide equal protection of the laws").   The EHA was an attempt to relieve the fiscal burden placed on States and localities by their responsibility to provide education for all handicapped children.   20 U. S. C. §§ 1400(b)(8) and (9). At the same time, however, Congress made clear that the EHA is not simply a funding statute.   The responsibility for providing the required education remains on the States. S. Rep. No. 94–168, at 22.   And the Act establishes an enforceable substantive right to a free appropriate public education.   See *Board of Education of Hendrick Hudson Central School Dist. v. Rowley*, 458 U. S. 176 (1982).   See also 121 Cong. Rec. 37417 (1975) (statement of Sen. Schweiker: "It can no longer be the policy of the Government to merely establish an unenforceable goal requiring all children to be in school.   [The bill] takes positive necessary steps to insure that the rights of children and their families are protected").[13]   Finally, the Act establishes an elaborate procedural mechanism to protect the rights of handicapped

---

[13] Prior to 1975, federal provisions for the education of handicapped children were contained in the EHA, passed in 1970, 84 Stat. 175, and amended in 1974, 88 Stat. 579 (current version at 20 U. S. C. § 1400 *et seq.*).   The Act then provided for grants to States to facilitate the development of programs for the education of handicapped children.   § 611(a). The only requirements imposed on the States were that they use federal funds on programs designed to meet the special education needs of handicapped children, § 613(a), and that parents or guardians be guaranteed minimum procedural safeguards, including prior notice and an opportunity to be heard when a State proposed to change the educational placement of the child.   § 614 (d).   See n. 4, *supra.*

children. The procedures not only ensure that hearings conducted by the State are fair and adequate. They also effect Congress' intent that each child's individual educational needs be worked out through a process that begins on the local level and includes ongoing parental involvement, detailed procedural safeguards, and a right to judicial review. §§ 1412(4), 1414(a)(5), 1415. See also S. Rep. No. 94–168, at 11–12 (emphasizing the role of parental involvement in assuring that appropriate services are provided to a handicapped child); *id.*, at 22; *Board of Education of Hendrick Hudson Central School Dist.* v. *Rowley*, 458 U. S., at 208–209.

In light of the comprehensive nature of the procedures and guarantees set out in the EHA and Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child, we find it difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free appropriate public education.[14] Not only would such a result render superfluous most of the detailed procedural protections outlined in the statute,

---

[14] The District Court in this case relied on similar reasoning—that Congress could not have meant for a plaintiff to be able to circumvent the EHA administrative process—and concluded that a handicapped child asserting an equal protection claim to public education was required to exhaust his administrative remedies before making his § 1983 claim. See *Turillo* v. *Tyson*, 535 F. Supp. 577, 583 (RI 1982), cited in the District Court's oral decision of April 30, 1982, App. to Pet. for Cert. A40. Because exhaustion was required, the court, relying on *New York Gaslight Club, Inc.* v. *Carey*, 447 U. S. 54 (1980), concluded that attorney's fees were appropriate under § 1988 for work performed in the state administrative process.

The difference between *Carey* and this case is that in *Carey* the statute that authorized fees, Title VII of the Civil Rights Act of 1964, also required a plaintiff to pursue available state administrative remedies. In contrast, nothing in § 1983 requires that a plaintiff exhaust his administrative remedies before bringing a § 1983 suit. See *Patsy* v. *Florida Board of Regents*, 457 U. S. 496 (1982). If § 1983 stood as an independent avenue of relief for petitioners, then they could go straight to court to assert it.

but, more important, it would also run counter to Congress'
view that the needs of handicapped children are best accom-
modated by having the parents and the local education
agency work together to formulate an individualized plan for
each handicapped child's education. No federal district
court presented with a constitutional claim to a public
education can duplicate that process.

We do not lightly conclude that Congress intended to pre-
clude reliance on § 1983 as a remedy for a substantial equal
protection claim. Since 1871, when it was passed by Con-
gress, § 1983 has stood as an independent safeguard against
deprivations of federal constitutional and statutory rights.
See *Patsy* v. *Florida Board of Regents*, 457 U. S. 496 (1982);
*Mitchum* v. *Foster*, 407 U. S. 225, 242 (1972); *Monroe* v.
*Pape*, 365 U. S. 167, 183 (1961). Nevertheless, § 1983 is a
statutory remedy and Congress retains the authority to re-
peal it or replace it with an alternative remedy.[15] The crucial
consideration is what Congress intended. See *Brown* v.
*GSA*, 425 U. S. 820, 825–829 (1976); *Johnson* v. *Railway
Express Agency, Inc.*, 421 U. S. 454, 459 (1975); *Adickes*
v. *S. H. Kress & Co.*, 398 U. S. 144, 151, n. 5 (1970).

In this case, we think Congress' intent is clear. Allowing
a plaintiff to circumvent the EHA administrative remedies
would be inconsistent with Congress' carefully tailored
scheme. The legislative history gives no indication that
Congress intended such a result.[16] Rather, it indicates that

---

[15] There is no issue here of Congress' ability to preclude the federal courts
from granting a remedy for a constitutional deprivation. Even if Con-
gress repealed all statutory remedies for constitutional violations, the
power of federal courts to grant the relief necessary to protect against con-
stitutional deprivations or to remedy the wrong done is presumed to be
available in cases within their jurisdiction. See *Bell* v. *Hood*, 327 U. S.
678, 684 (1946); *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S.
388, 396 (1971); *id.*, at 400–406 (Harlan, J., concurring in judgment).

[16] Petitioners insist that regardless of the wisdom of requiring resort to
available EHA remedies before a handicapped child may seek judicial re-

Congress perceived the EHA as the most effective vehicle for protecting the constitutional right of a handicapped child to a public education. We conclude, therefore, that where the EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or on the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim.

## C

Petitioners also made a due process challenge to the partiality of the state hearing officer. The question whether this claim will support an award of attorney's fees has two aspects—whether the procedural safeguards set out in the EHA manifest Congress' intent to preclude resort to § 1983

view, Congress specifically indicated that it did not intend to limit the judicial remedies otherwise available to a handicapped child. If that were true, we would agree with petitioners that Congress' intent is controlling and that a § 1983 remedy remained available to them. See *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 459 (1975). The sentence in the legislative history on which petitioners rely, however, is not the clear expression of congressional intent petitioners would like it to be.

The sentence on which petitioners rely is included in the Committee Report of the Senate's version of the EHA. S. Rep. No. 94–168, pp. 27–28 (1975). The Senate bill included a requirement, not in the Conference bill, see S. Conf. Rep. No. 94–455, pp. 39–40 (1975), that the States set up an entity for ensuring compliance with the EHA. The compliance entity would be authorized, *inter alia*, to receive complaints regarding alleged violations of the Act. The Committee added that it did "not intend the existence of such an entity to limit the right of individuals to seek redress of grievances through other avenues, such as bringing civil action in Federal or State courts to protect and enforce the rights of handicapped children under applicable law." S. Rep. No. 94–168, at 26. In the context in which the statement was made, it appears to establish nothing more than that handicapped children retain a right to judicial review of their individual cases. It does not establish that they can choose whether to avail themselves of the EHA process or go straight to court with an equal protection claim.

on a due process challenge and, if not, whether petitioners are entitled to attorney's fees for their due process claim. We find it unnecessary to resolve the first question, because we are satisfied that even if an independent due process challenge may be maintained, petitioners are not entitled to attorney's fees for their particular claim.[17]

---

[17] We note that the issue is not the same as that presented by a substantive equal protection claim to a free appropriate public education. The EHA does set out specific procedural safeguards that must be guaranteed by a State seeking funds under the Act. See 20 U. S. C. § 1415. And although some courts have concluded that the EHA does not authorize injunctive relief to remedy procedural deficiencies, see, e. g., *Hymes* v. *Harnett County Board of Education*, 664 F. 2d 410 (CA4 1981), other courts have construed the district courts' authority under § 1415(e)(2) to grant "appropriate relief" as including the authority to grant injunctive relief, either after an unsuccessful and allegedly unfair administrative proceeding, or prior to exhaustion of the state remedies if pursuing those remedies would be futile or inadequate. See, e. g., *Robert M.* v. *Benton*, 622 F. 2d 370 (CA8 1980); *Monahan* v. *Nebraska*, 491 F. Supp. 1074 (Neb. 1980), aff'd in part and vacated in part, 645 F. 2d 592 (CA8 1981); *Howard S.* v. *Friendswood Independent School District*, 454 F. Supp. 634 (SD Tex. 1978); *Armstrong* v. *Kline*, 476 F. Supp. 583, 601–602 (ED Pa. 1979), remanded on other grounds *sub nom. Battle* v. *Pennsylvania*, 629 F. 2d 269 (CA3 1980), cert. denied, 452 U. S. 968 (1981); *North* v. *District of Columbia Board of Education*, 471 F. Supp. 136 (DC 1979). See also 121 Cong. Rec. 37416 (1975) (remarks of Sen. Williams) ("exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter").

On the other hand, unlike an independent equal protection claim, maintenance of an independent due process challenge to state procedures would not be inconsistent with the EHA's comprehensive scheme. Under either the EHA or § 1983, a plaintiff would be entitled to bypass the administrative process by obtaining injunctive relief only on a showing that irreparable harm otherwise would result. See *Monahan* v. *Nebraska*, 645 F. 2d, at 598–599. And, while Congress apparently has determined that local and state agencies should not be burdened with attorney's fees to litigants who succeed, through resort to the procedures outlined in the EHA, in requiring those agencies to provide free schooling, there is no indication that agencies should be exempt from a fee award where plaintiffs have had to

Petitioners' plea for injunctive relief was not made until after the administrative proceedings had ended. They did not seek an order requiring the Commissioner of Education to grant them a new hearing, but only a declaratory judgment that the state Regulations did not comply with the requirements of due process and the EHA, and an injunction prohibiting the Commissioner from conducting further hearings under those Regulations. App. 59–60. That due process claim and the substantive claim on which petitioners ultimately prevailed involved entirely separate legal theories and, more important, would have warranted entirely different relief. According to their complaint, petitioners did not even seek relief for themselves on the due process claim, but sought only to protect the rights of others coming after them in the administrative process. The efforts petitioners subsequently expended in the judicial process addressed only the substantive question as to which agency, as a matter of state and federal law, was required to pay for Tommy's education. Whether or not the state procedures accorded petitioners the process they were due had no bearing on that substantive question.

We conclude that where, as here, petitioners have presented distinctly different claims for different relief, based on different facts and legal theories, and have prevailed only on a nonfee claim, they are not entitled to a fee award simply because the other claim was a constitutional claim that could be asserted through § 1983. We note that a contrary conclusion would mean that every EHA plaintiff who seeks judicial review after an adverse agency determination could ensure a fee award for successful judicial efforts simply by including in his substantive challenge a claim that the administrative process was unfair. If the court ignored the due process claim but granted substantive relief, the due process claim could be considered a substantial unaddressed constitutional

resort to judicial relief to force the agencies to provide them the process they were constitutionally due.

claim and the plaintiff would be entitled to fees.[18]   It is unlikely that Congress intended such a result.

## IV

We turn, finally, to petitioners' claim that they were entitled to fees under § 505 of the Rehabilitation Act, because they asserted a substantial claim for relief under § 504 of that Act.

Much of our analysis of petitioners' equal protection claim is applicable here.   The EHA is a comprehensive scheme designed by Congress as the most effective way to protect the right of a handicapped child to a free appropriate public education.   We concluded above that in enacting the EHA, Congress was aware of, and intended to accommodate, the claims of handicapped children that the Equal Protection Clause required that they be ensured access to public education.   We also concluded that Congress did not intend to have the EHA scheme circumvented by resort to the more general provisions of § 1983.   We reach the same conclusion regarding petitioners' § 504 claim.   The relationship between the EHA and § 504, however, requires a slightly different analysis from that required by petitioners' equal protection claim.

Section 504 and the EHA are different substantive statutes.   While the EHA guarantees a right to a free appropriate public education, § 504 simply prevents discrimination on the basis of handicap.   But while the EHA is limited to handicapped children seeking access to public education,

---

[18] Even if the court denied the due process claim, as here, it is arguable that the plaintiff would be entitled to have an appellate court determine whether the district court was correct in its ruling on the due process claim.   In this case, the District Court ruled against petitioners on their due process claim, and the Court of Appeals determined, on appeal from the District Court's award of substantive relief, that the issue was moot. Nevertheless, in considering the propriety of the District Court's award of fees, the Court of Appeals recognized that the due process claim was at least substantial enough to support federal jurisdiction.   703 F. 2d, at 7.

§ 504 protects handicapped persons of all ages from discrimination in a variety of programs and activities receiving federal financial assistance.

Because both statutes are built around fundamental notions of equal access to state programs and facilities, their substantive requirements, as applied to the right of a handicapped child to a public education, have been interpreted to be strikingly similar. In regulations promulgated pursuant to § 504, the Secretary of Education [19] has interpreted § 504 as requiring a recipient of federal funds that operates a public elementary or secondary education program to provide a free appropriate public education to each qualified handicapped person in the recipient's jurisdiction. 34 CFR § 104.33(a) (1983). [20] The requirement extends to the provision of a public or private residential placement if necessary to provide a free appropriate public education. § 104.33(c)(3). The regulations also require that the recipient implement procedural safeguards, including notice, an opportunity for the parents or guardian to examine relevant records, an impartial hearing with opportunity for participation by the parents or guardian and representation by counsel, and a review procedure. § 104.36. The Secretary declined to require the exact EHA procedures, because those procedures might be inappropriate for some recipients not subject to the EHA, see 34

---

[19] The regulations were promulgated by the Secretary of Health, Education, and Welfare (HEW). 42 Fed. Reg. 22676 (1977). The functions of the Secretary of HEW under the Rehabilitation Act and under the EHA were transferred in 1979 to the Secretary of Education under the Department of Education Organization Act, § 301(a), 93 Stat. 677, 20 U. S. C. § 3441(a).

[20] Regulations under § 504 and the EHA were being formulated at the same time. The § 504 regulations were effective June 3, 1977. 42 Fed. Reg., at 22676. The EHA regulations were effective October 1, 1977. Id., at 42474. The Secretary of HEW and the Commissioner of Education emphasized the coordination of effort behind the two sets of regulations and the Department's intent that the § 504 regulations be consistent with the requirements of the EHA. See 41 Fed. Reg. 56967 (1976); 42 Fed. Reg., at 22677.

CFR, Subtitle B, ch. 1, App. A, p. 371 (1983), but indicated that compliance with EHA procedures would satisfy § 104.36.

On the other hand, although both statutes begin with an equal protection premise that handicapped children must be given access to public education, it does not follow that the affirmative requirements imposed by the two statutes are the same. The significant difference between the two, as applied to special education claims, is that the substantive and procedural rights assumed to be guaranteed by both statutes are specifically required only by the EHA.

Section 504, 29 U. S. C. § 794, provides, in pertinent part:

> "No otherwise qualified handicapped individual in the United States, . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

In *Southeastern Community College* v. *Davis*, 442 U. S. 397 (1979), the Court emphasized that § 504 does not require affirmative action on behalf of handicapped persons, but only the absence of discrimination against those persons. 442 U. S., at 411–412. In light of *Davis*, courts construing § 504 as applied to the educational needs of handicapped children have expressed confusion about the extent to which § 504 requires special services necessary to make public education accessible to handicapped children.[21]

In the EHA, on the other hand, Congress specified the affirmative obligations imposed on States to ensure that

---

[21] Courts generally have upheld the § 504 regulations on the grounds that they do not require extensive modification of existing programs and that States and localities generally provide nonhandicapped children with educational services appropriate to their needs. See *Phipps* v. *New Hanover County Board of Education*, 551 F. Supp. 732 (EDNC 1982). But see *Colin K. by John K.* v. *Schmidt*, 715 F. 2d 1, 9 (CA1 1983) (in light of *Davis*, requirement that a school system provide a private residential placement could not be imposed under § 504).

equal access to a public education is not an empty guarantee, but offers some benefit to a handicapped child. Thus, the statute specifically requires "such . . . supportive services . . . as may be required to assist a handicapped child to benefit from special education," see *Board of Education* v. *Rowley*, 458 U. S., at 200, including, if the public facilities are inadequate for the needs of the child, "instruction in hospitals and institutions." 20 U. S. C. §§ 1401(16) and (17).

We need not decide the extent of the guarantee of a free appropriate public education Congress intended to impose under § 504. We note the uncertainty regarding the reach of § 504 to emphasize that it is only in the EHA that Congress specified the rights and remedies available to a handicapped child seeking access to public education. Even assuming that the reach of § 504 is coextensive with that of the EHA, there is no doubt that the remedies, rights, and procedures Congress set out in the EHA are the ones it intended to apply to a handicapped child's claim to a free appropriate public education. We are satisfied that Congress did not intend a handicapped child to be able to circumvent the requirements or supplement the remedies of the EHA by resort to the general antidiscrimination provision of § 504.

There is no suggestion that § 504 adds anything to petitioners' substantive right to a free appropriate public education.[22] The only elements added by § 504 are the possibility of circumventing EHA administrative procedures and going straight to court with a § 504 claim,[23] the possibility of a dam-

---

[22] Of course, if a State provided services beyond those required by the EHA, but discriminatorily denied those services to a handicapped child, § 504 would remain available to the child as an avenue of relief. In view of the substantial overlap between the two statutes and Congress' intent that efforts to accommodate educational needs be made first on the local level, the presumption in a case involving a claim arguably within the EHA should be that the plaintiff is required to exhaust EHA remedies, unless doing so would be futile.

[23] Lower courts appear to agree, however, that unless doing so would be futile, EHA administrative remedies must be exhausted before a § 504

ages award in cases where no such award is available under the EHA,[24] and attorney's fees.   As discussed above, Congress' intent to place on local and state educational agencies the responsibility for determining the most appropriate educational plan for a handicapped child is clear.   To the extent § 504 otherwise would allow a plaintiff to circumvent that state procedure, we are satisfied that the remedy conflicts with Congress' intent in the EHA.

Congress did not explain the absence of a provision for a damages remedy and attorney's fees in the EHA.   Several references in the statute itself and in its legislative history, however, indicate that the omissions were in response to Congress' awareness of the financial burden already imposed on States by the responsibility of providing education for handicapped children.   As noted above, one of the stated purposes of the statute was to relieve this financial burden. See 20 U. S. C. §§ 1400(b)(8) and (9).   Discussions of the EHA by its proponents reflect Congress' intent to "make every resource, or as much as possible, available to the direct activities and the direct programs that are going to benefit the handicapped."   121 Cong. Rec. 19501 (1975) (remarks of Sen. Dole).   See also id., at 37025 (procedural safeguards designed to further the congressional goal of ensuring full educational opportunity without overburdening the local school districts and state educational agencies) (remarks of

claim for the same relief available under the EHA may be brought.   See, e. g., Riley v. Ambach, 668 F. 2d 635 (CA2 1981); Phipps v. New Hanover County Board of Education, supra; Harris v. Campbell, 472 F. Supp. 51 (ED Va. 1979); H. R. v. Hornbeck, 524 F. Supp. 215 (Md. 1981).

[24] There is some confusion among the Circuits as to the availability of a damages remedy under § 504 and under the EHA.   Without expressing an opinion on the matter, we note that courts generally agree that damages are available under § 504, but are available under the EHA only in exceptional circumstances.   See, e. g., Miener v. Missouri, 673 F. 2d 969, 978 (CA8), cert. denied, 459 U. S. 909 (1982); Anderson v. Thompson, 658 F. 2d 1205 (CA7 1981); Monahan v. Nebraska, 491 F. Supp., at 1094; Hurry v. Jones, 560 F. Supp. 500 (RI 1983); Gregg B. v. Board of Education of Lawrence School District, 535 F. Supp. 1333, 1339–1340 (EDNY 1982).

Rep. Perkins); S. Rep. No. 94–168, at 81 (minority views cognizant of financial burdens on localities). The Act appears to represent Congress' judgment that the best way to ensure a free appropriate public education for handicapped children is to clarify and make enforceable the rights of those children while at the same time endeavoring to relieve the financial burden imposed on the agencies responsible to guarantee those rights. Where § 504 adds nothing to the substantive rights of a handicapped child, we cannot believe that Congress intended to have the careful balance struck in the EHA upset by reliance on § 504 for otherwise unavailable damages or for an award of attorney's fees.

We emphasize the narrowness of our holding. We do not address a situation where the EHA is not available or where § 504 guarantees substantive rights greater than those available under the EHA. We hold only that where, as here, whatever remedy might be provided under § 504 is provided with more clarity and precision under the EHA, a plaintiff may not circumvent or enlarge on the remedies available under the EHA by resort to § 504.

In light of our conclusion that § 504 was not available to petitioners as an alternative basis for the relief they sought, we need not decide whether, as petitioners urge, § 505 authorizes attorney's fees for substantial, unaddressed § 504 claims or whether a Rehabilitation Act claim is entitled only to a "determination on the . . . claim for the purpose of awarding counsel fees." H. R. Rep. No. 94–1558, at 4, n. 7.

## V

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

In this case we are called upon to analyze the interaction among five statutory provisions: § 1 of the Civil Rights Act of

1871, as amended, 42 U. S. C. § 1983; § 2 of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988; § 504 of the Rehabilitation Act of 1973, as amended, 29 U. S. C. § 794; § 505(b) of the Rehabilitation Act, 29 U. S. C. § 794a(b); and § 615(e)(2) of the Education of the Handicapped Act (EHA or Act), as added, 89 Stat. 789, 20 U. S. C. § 1415(e)(2).

Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of *any rights, privileges, or immunities secured by the Constitution* and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (Emphasis added.)

And § 1988 provides that the prevailing party in an action prosecuted under § 1983 may be awarded reasonable attorney's fees. Similarly, §§ 504 and 505(b) of the Rehabilitation Act provide a cause of action and attorney's fees, respectively, to an individual who, "solely by reason of his handicap," has been "excluded from the participation in, . . . denied the benefits of, . . . [or] subjected to discrimination under any program or activity receiving Federal financial assistance." Finally, § 615(e)(2) of the EHA authorizes judicial review of the States' provision of "free appropriate public education" to handicapped children. Unlike 42 U. S. C. § 1983 and § 504 of the Rehabilitation Act, however, § 615(e)(2) has no counterpart in the EHA authorizing the award of attorney's fees to prevailing parties.

Petitioners challenge Rhode Island's discriminatory failure to afford Thomas F. Smith III access to certain educational programs made available to other handicapped children. As the Court recognizes, *ante,* at 1006, 1007, 1008–1009, this challenge states a meritorious claim under the EHA and a

substantial claim under the Equal Protection Clause of the Fourteenth Amendment. In addition, petitioners' claim appears to fall squarely within the terms of § 504 of the Rehabilitation Act. Consequently, if §§ 504 and 1983 are available as bases for petitioners' action, petitioners are entitled to recover reasonable attorney's fees under § 1988 and, at a minimum, to be given an opportunity to establish the meritoriousness of their § 504 claim. *Maher* v. *Gagne*, 448 U. S. 122 (1980); H. R. Rep. No. 94–1558, p. 4, n. 7 (1976); Brief for Petitioners 61–62, n. 26 (legislative history establishes that § 505(b) incorporates standards governing § 1988).[1]

To determine whether § 504 or § 1983 is available, each provision must be read together with the EHA.[2] As the Court demonstrates, in enacting the EHA, Congress surely intended that individuals with claims covered by that Act

---

[1] The Court holds that petitioners may not recover any fees for this lawsuit. That result is wrong, I believe, without regard to whether § 505(b) requires an unlitigated § 504 claim to be meritorious or merely "substantial." Even if petitioners must establish the meritoriousness, and not just the substantiality, of their unlitigated § 504 claim, affirmance of the Court of Appeals' judgment would be improper, for petitioners have been given no opportunity to establish that their § 504 claim has merit and because petitioners are entitled to fees under § 1988. Since I think petitioners are entitled to fees under § 1988, and since even my dissent from the Court's holding on § 505(b) does not depend on whether the substantiality standard applies to unlitigated § 504 claims, I do not address that question.

I also need not consider what effect petitioners' due process claim against respondents, *ante*, at 1013–1016, may have on petitioners' entitlement to fees. I dissent from the Court's holding because I believe that petitioners are entitled to fees under § 1988 and may be entitled to fees under § 505(b) of the Rehabilitation Act. Petitioners' due process claim might have a bearing on the amount of fees they should recover, but it does not deprive petitioners of all entitlement to a fee award.

[2] Some claims covered by the EHA are also grounded in the Constitution and hence could be pursued under § 1983. Others are nonconstitutional claims cognizable under § 504. Still others are nonconstitutional claims cognizable only under the EHA. This case is concerned only with claims that have as a substantive basis both the EHA and either the Constitution or § 504.

would pursue relief through the administrative channels that the Act established before seeking redress in court. See *ante*, at 1009–1013, 1016–1019. It would make little sense for Congress to have established such a detailed and comprehensive administrative system and yet allow individuals to bypass the system, at their option, by bringing suits directly to the courts under either § 504 or § 1983. To that extent, therefore, the statutes before us are in conflict with one another. Accordingly, our guide must be the familiar principle of statutory construction that conflicting statutes should be interpreted so as to give effect to each but to allow a later enacted, more specific statute to amend an earlier, more general statute only to the extent of the repugnancy between the two statutes. *Watt* v. *Alaska*, 451 U. S. 259, 267 (1981); *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 153 (1976); *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974). We must, therefore, construe the statutory provisions at issue here so as to promote the congressional intent underlying the EHA, which was enacted after §§ 504 and 1983 and which is addressed specifically to the problems facing handicapped schoolchildren. At the same time, however, we must preserve those aspects of §§ 504 and 1983 that are not in irreconcilable conflict with the EHA.

The natural resolution of the conflict between the EHA, on the one hand, and §§ 504 and 1983, on the other, is to require a plaintiff with a claim covered by the EHA to pursue relief through the administrative channels established by that Act before seeking redress in the courts under § 504 or § 1983. Under this resolution, the integrity of the EHA is preserved entirely, and yet §§ 504 and 1983 are also preserved to the extent that they do not undermine the EHA. Although the primary function of §§ 504 and 1983 is to provide direct access to the courts for certain types of claims, these provisions also operate, as this case demonstrates, to identify those types of causes of action for which Congress has authorized the award of attorney's fees to prevailing parties. Significantly, this

function does not in any way conflict with the goals or operation of the EHA. There is no basis, therefore, for concluding that either § 504 or § 1983 is unavailable for this limited purpose.

The Court, however, has responded to the conflict among these statutes by restricting the applicability of §§ 504 and 1983 far more than is necessary to resolve their inconsistency. Indeed, the Court holds that both §§ 504 and 1983 are wholly unavailable to individuals seeking to secure their rights to a free appropriate public education, despite the fact that the terms and intent of Congress in enacting each of these provisions unquestionably extend to many of those claims. As a result, the Court finds that attorney's fees, which would otherwise be available to those individuals under §§ 505(b) and 1988, are now unavailable. Yet the Court recognizes that there is absolutely no indication in the language of the EHA or in the Act's legislative history that Congress meant to effect such a repeal, let alone any indication that Congress specifically intended to bar the recovery of attorney's fees for parties that prevail in this type of action. The Court's rationale for effectively repealing §§ 504, 505(b), 1983, and 1988 to the extent that they cover petitioners' claim is that the comprehensiveness and detail with which the EHA addresses the problem of providing schooling to handicapped children implies that Congress intended to repeal all other remedies that overlap with the EHA, even if they do not conflict with the EHA.[3]

---

[3] The Court at one point seems to indicate that Congress actually considered the question of withholding attorney's fees from prevailing parties in actions covered by the EHA. *Ante*, at 1020–1021. But at the time the EHA was enacted, neither § 505(b) of the Rehabilitation Act nor § 1988 had yet been enacted. In that context, congressional silence on the question of attorney's fees can only be interpreted to indicate that Congress did not consider the matter. Thus, this claim is particularly unpersuasive and, in fact, does not appear to constitute a significant basis of the Court's decision.

Repeals by implication, however, are strongly disfavored. *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S. 772, 788 (1981); *Morton* v. *Mancari, supra*, at 550; *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). And, as stated above, they are tolerated only to the extent necessary to resolve clear repugnancy between statutes. *Radzanower* v. *Touche Ross & Co., supra*, at 154; *Posadas* v. *National City Bank, supra*, at 503. The function that §§ 504 and 1983 perform of identifying those claims for which attorney's fees are authorized under §§ 505(b) and 1988 is not repugnant to the EHA. The Court therefore has erred in concluding that petitioners cannot obtain attorney's fees.

In cases like this, it is particularly important that the Court exercise restraint in concluding that one Act of Congress implicitly repeals another, not only to avoid misconstruction of the law effecting the putative repeal, but also to preserve the intent of later Congresses that have already enacted laws that are dependent on the continued applicability of the law whose implicit repeal is in question. By failing to exercise such restraint here, and hence concluding that the EHA implicitly repealed, in part, §§ 504 and 1983, the Court has not only misconstrued the congressional intent underlying the EHA, it has also frustrated Congress' intent in enacting §§ 505(b) and 1988—each of which was enacted after the EHA and premised on a view of §§ 504 and 1983 that was significantly more expansive than that offered by the Court today. Although in enacting the EHA, Congress was silent with respect to the continued availability of §§ 504 and 1983 for claims that could be brought directly under the EHA, there can be no doubt that, at the time §§ 505(b) and 1988 were passed, Congress believed that the EHA had not eliminated these alternative remedies. Congressional understanding at these later points certainly sheds light on Congress' earlier intent in enacting the EHA, but perhaps more importantly, it demonstrates the extent to which the Court's finding of an implicit repeal has undermined the congressional intent behind the enactment of §§ 505(b) and 1988.

The Department of Health, Education, and Welfare (HEW) promulgated regulations under § 504 of the Rehabilitation Act *after* the EHA was passed. Those regulations contained a lengthy subpart governing the provision of education to the handicapped stating: "A recipient that operates a public elementary or secondary education program shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 42 Fed. Reg. 22676, 22682 (1977). Thus, the Department charged with enforcing the Rehabilitation Act and the EHA did not understand the latter to repeal the former with respect to handicapped education.[4] And, of course, the interpretation of the Act by the agency responsible for its enforcement is entitled to great deference. *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 434 (1971). Furthermore, Congress was very much aware of HEW's interpretation of the two Acts. During oversight hearings on the Rehabilitation Act, held after the enactment of the EHA, representatives of HEW testified that the agency had recently promulgated regulations under § 504 and that those regulations addressed discrimination in the provision of education to handicapped children.[5] Hearings on Implementation of Section 504, Rehabilitation Act of 1973, before the Subcommittee on Select Education of the House Committee on Education and Labor, 95th Cong., 1st Sess., 296–297 (1977) (statement of David Tatel, Director,

---

[4] As the Court notes, *ante*, at 1017, n. 20, the regulations promulgated under § 504 and the EHA were closely coordinated with one another. See 42 Fed. Reg. 22677 (1977).

[5] In addition, testimony was generally taken on the success of § 504 as applied to discrimination against handicapped children in the provision of publicly funded education. See, *e. g.*, Hearings on Implementation of Section 504, Rehabilitation Act of 1973, before the Subcommittee on Select Education of the House Committee on Education and Labor, 95th Cong., 1st Sess., 263–265 (1977) (statement of Daniel Yohalem, Children's Defense Fund); *id.*, at 278–285 (statement of Edward E. Corbett, Jr., Maryland School for the Deaf).

Office for Civil Rights, Department of Health, Education, and Welfare);[6] Hearings on the Rehabilitation of the Handicapped Programs, 1976, before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare, 94th Cong., 2d Sess., 1498, 1499, 1508, 1539–1546 (1976) (statement of Martin H. Gerry, Director, Office for Civil Rights, Department of Health, Education, and Welfare). No member of the House or Senate Subcommittee raised any question regarding § 504's continued coverage of discrimination in education after the passage of the EHA.

Indeed, the Senate Report accompanying the bill that included § 505(b) of the Rehabilitation Act explicitly referred to, and approved, the regulations promulgated under § 504. The Report then went on to address the need for attorney's fees, referring to the rights that § 504 extended to handicapped individuals generally and intimating no exception for handicapped children seeking education. S. Rep. No. 95–890, pp. 19–20 (1978).

Similarly, the House Report stated:

"The proposed amendment is not in any way unique. At present there are at least 90 separate attorney's fees provisions to promote enforcement of over 90 different

---

[6] Mr. Tatel's testimony included the following:

"With regard to preschool, elementary, and secondary education institutions, the regulations require:

"—annual identification and location of unserved hadicapped children;

"—free appropriate public education to each qualified handicapped child regardless of the nature or severity of the handicap (including coverage of nonmedical care, room and board where residential placement required);

"—education of handicapped students to maximum extent possible;

"—comparability of facilities (including services and activities provided therein) identifiable as being for handicapped persons;

"—evaluation requirements to insure proper classification and placement of handicapped children and procedural safeguards;

"—equal opportunity for participation of handicapped students in non-academic and extracurricular services and activities." *Id.*, at 296.

Federal laws. In fact, disabled individuals are one of the very few minority groups in this country who have not been authorized by the Congress to seek attorney's fees. The amendment proposes to correct this omission and thereby assist handicapped individuals in securing the legal protection guaranteed them under title V of the Act." H. R. Rep. No. 95–1149, p. 21 (1978).

Neither the terms nor the logic of this statement admits of the possibility that Congress intended to exclude from the coverage of § 505(b) the claims of handicapped children seeking a free appropriate public education.

Finally, although Congress, in enacting § 1988, did not specifically refer to the applicability of § 1983 to constitutional claims by handicapped children seeking education, it clearly intended to authorize attorney's fees in all cases involving the deprivation of civil rights. Adopted in response to this Court's decision in *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975), § 1988 was intended to close "anomalous gaps in our civil rights laws whereby awards of fees are . . . unavailable." S. Rep. No. 94–1011, p. 4 (1976). The Senate Report thus stated:

> "In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.
>
> .         .         .         .         .
>
> " 'Not to award counsel fees in cases such as this would be tantamount to repealing the Act itself by frustrating its basic purpose. . . . Without counsel fees the grant of Federal jurisdiction is but an empty gesture . . . .' *Hall*

v. *Cole*, 412 U. S. 1 (1973), quoting 462 F. 2d 777, 780–81 (2d Cir. 1972).

"The remedy of attorneys' fees has always been recognized as particularly appropriate in the civil rights area, and civil rights and attorneys' fees have always been closely interwoven." *Id.*, at 2–3.

It would be anomalous, to say the least, for Congress to have passed a provision as broad as § 1988, and to provide an equally broad explanation, and yet to leave a "gap" in its own coverage of the constitutional claims of handicapped children seeking a free appropriate public education.[7]   See also H. R. Rep. No. 94–1558, pp. 4–5 (1976).

In sum, the Court's conclusion that the EHA repealed the availability of §§ 504 and 1983 to individuals seeking a free appropriate public education runs counter to well-established principles of statutory interpretation.   It finds no support in the terms or legislative history of the EHA.   And, most importantly, it undermines the intent of Congress in enacting both §§ 505(b) and 1988.   Had this case arisen prior to the enactment of §§ 505(b) and 1988, Congress could have taken account of the Court's expansive interpretation of the EHA. Presumably, it would have either clarified the applicability of §§ 504 and 1983 to claims for a free appropriate public education, or it would have extended the coverage of §§ 505(b) and 1988 to certain claims brought under the EHA.   But with today's decision coming as it does after Congress has

----

[7] Moreover, Congress was fully aware of the possibility that the same claim in the civil rights area might have duplicative statutory remedies. For instance, one of the "gaps" that Congress sought to close in enacting § 1988 was the possibility that an individual could bring an employment discrimination suit under Title VII of the 1964 Civil Rights Act and receive attorney's fees, although another individual bringing the same suit under 42 U. S. C. § 1981 could not recover attorney's fees.   S. Rep. No. 94–1011, p. 4 (1976).   Congress' response to this situation was to ensure that attorney's fees would be available under either provision.

spoken on the subject of attorney's fees, Congress will now have to take the time to revisit the matter. And until it does, the handicapped children of this country whose difficulties are compounded by discrimination and by other deprivations of constitutional rights will have to pay the costs. It is at best ironic that the Court has managed to impose this burden on handicapped children in the course of interpreting a statute wholly intended to promote the educational rights of those children.