CREST STREET COMMUNITY COUN-
CIL, INC.; Residents of Crest Street
Community; Save Our Church & Com-
munity Committee, Appellants,

v.

NORTH CAROLINA DEPARTMENT OF
TRANSPORTATION; North Carolina
Board of Transportation; James E.
Harrington, Secretary of the North
Carolina Department of Transportation
and Chairman of the North Carolina
Board of Transportation, Appellees.

No. 85–1008.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1985.
Decided Aug. 15, 1985.

Michael D. Calhoun, Durham, N.C.
(North Cent. Legal Assistance Program on
brief), for appellants.

James B. Richmond, Sp. Deputy Atty. Gen., Raleigh, N.C. (Lacy H. Thornburg, Atty. Gen., Raleigh, N.C., on brief), for appellees.

Before WINTER, Chief Judge, and WIDENER and CHAPMAN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

The prevailing parties in a federal administrative action involving Title VI of the Civil Rights Act of 1964 sought to recover attorney's fees under 42 U.S.C. § 1988 in an independent action in federal district court. The district court denied their request. We reverse.

I.

Plaintiffs represent residents of Crest Street community, a well-established, predominantly black neighborhood in Durham, North Carolina.[1] Prior to late 1976, the City of Durham had requested, and defendant North Carolina Department of Transportation (NCDOT) had planned, extension of the East-West Freeway through the Crest Street community. The proposed extension was a federal-aid highway project, with approximately 75% of its costs to be paid by federal funds. The proposed highway extension would have destroyed much of the community, including its church and park, and would have splintered the remainder into isolated sectors likely to undergo commercial development. The lengthy planning period for construction of the freeway discouraged public and private development and maintenance in the Crest Street community for many years.

NCDOT's plans for the extension remained dormant for several years, but active planning resumed in 1976. In March 1977, plaintiffs retained the North Central Legal Assistance Program as counsel to represent them concerning the defendants' planning and constructing of the freeway and remedial efforts to mitigate the adverse impact of the project. During 1977 and 1978, the residents and organizations of the Crest Street community expressed their opposition to construction of the freeway through the Crest Street community, but defendants proceeded with issuing a revised draft Environmental Impact Statement for the project.

Plaintiffs responded to defendants' new plans and revised Environmental Impact Statement by filing an administrative complaint in September 1978 with the United States Department of Transportation (DOT), as authorized by 49 C.F.R. § 21.-11(b) (1977). Plaintiffs sought an investigation of whether NCDOT's practices complied with Title VI of the Civil Rights Act of 1964 and other federal laws.[2] The administrative complaint sought prohibition of further planning or construction of the freeway and rejection of NCDOT's Environmental Impact Statement until the freeway project was brought into compliance with applicable laws.

As required by its regulations, 49 C.F.R. § 21.11(c), DOT investigated the freeway proposals and the allegations of the administrative complaint. On February 20, 1980, after the field investigation, the DOT Director of the Office of Civil Rights informed NCDOT of DOT's preliminary finding of reasonable cause to believe that con-

---

**1.** Plaintiffs Residents of Crest Street Community and Save Our Church and Community Committee are unincorporated associations whose members are residents of the Crest Street area and members of the New Bethel Baptist Church. The former was organized in 1976 for civic improvement purposes, and the latter was formed in 1977 as a subcommittee or agent of the former for the purpose of opposing the freeway extension. Plaintiff Crest Street Community Council, Inc. was incorporated in February of 1980 to assume the functions of the other two plaintiffs, including conducting the negotiations surrounding the previously-filed adminis-

trative complaint. For our purposes the three groups may be treated as one, and most further references will be simply to "plaintiffs."

**2.** The administrative complaint challenged defendants' proposal under provisions of the National Environmental Policy Act, 42 U.S.C. § 4331, the Federal-Aid Highway Act, 23 U.S.C. § 109, Title VIII of the Civil Rights Act of 1968 (fair housing), 42 U.S.C. § 3601, and various implementing regulations, as well as under Title VI.

struction according to the NCDOT proposal would constitute a prima facie violation of Title VI and of DOT's implementing regulations, particularly 49 C.F.R. § 21.5(b)(3).[3] The parties then took the next step in DOT's Title VI compliance process and began extensive negotiations to resolve their differences through "voluntary means."[4] Representatives from DOT, the Federal Highway Administration, and the City of Durham, as well as defendants, plaintiffs, and other opponents of the freeway, participated in these negotiations. In February 1982, plaintiffs, the City of Durham, and NCDOT reached a preliminary agreement for the freeway design, relocation assistance benefits, and other assistance in mitigation of the adverse impact of the project, but negotiations continued on a final assistance plan and ultimate resolution of all issues raised by the administrative complaint.

In August 1982, NCDOT moved to dissolve a 1973 order which had been entered in *ECOS, Inc. v. Brinegar*, No. C–352–D–72 (M.D.N.C.), enjoining construction of the freeway.[5] Plaintiffs and Willie Patterson, a resident of the Crest Street community, filed a proposed complaint and moved to intervene in the *ECOS* action on October 15, 1982. Their obvious purpose was to contest dissolution of the injunction until their interests were fully protected. While this motion for intervention was pending, the parties concluded their negotiations and prepared the Final Mitigation Plan, and the City of Durham and NCDOT prepared a complementary Municipal Agreement that accompanied the Final Mitigation Plan. The district court never formally ruled on the motion to intervene, but the applicants for intervention were parties to a December 14, 1982 Consent Judgment dissolving the injunction and dismissing the *ECOS* action.[6] On the following day, plaintiffs,

**3.** That section provides:

In determining the site or location of facilities, a recipient or applicant may not make selections with the purpose or effect of excluding persons from, denying them the benefits of, or subjecting them to discrimination under any program to which this regulation applies, on the grounds of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act or this part.

**4.** Title VI directs that "no such action [cutting off funding] shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d–1. DOT's regulations similarly provide that "[i]f an investigation pursuant to paragraph (c) of this section indicates a failure to comply with this part, the Secretary will so inform the recipient and the matter will be resolved by informal means whenever possible." 49 C.F.R. § 21.11(d)(1) (1984). Formal agency action is to be avoided unless the "threatened noncompliance cannot be corrected by informal means." 49 C.F.R. § 21.13(a) (1984).

**5.** Plaintiffs in the *ECOS* action were ECOS, Inc. (a non-profit, educational, ecological corporation), an association of Duke University students and some of its members, and two Durham residents. The defendants were state and

federal transportation officials and a construction company. The action had alleged violations of the public hearing requirement and the preservation of parkland requirements of the Federal-Aid Highway Act, 23 U.S.C. §§ 128, 138, the parkland preservation policy of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f), and the National Environmental Policy Act of 1969, 42 U.S.C. § 4332. The order enjoined steps toward construction of a section of the proposed freeway including that through the Crest Street area until the defendants achieved full compliance with the statutes allegedly violated.

**6.** The Consent Judgment provided, *inter alia,* that the state highway defendants and applicants for intervention had

resolved the things and matters in controversy between them by agreement adopted by the North Carolina Board of Transportation on November 19, 1982. The plaintiffs and applicants for intervention do not or no longer oppose the State defendants' motion to dissolve the injunction and do not wish to prosecute this action any further except that the applicants for intervention explicitly reserve the right to pursue all claims in their application for intervention and in addition reserve their claim for attorney fees against the State defendants and the North Carolina Department of Transportation and the plaintiffs reserve their right to pursue all claims relating to the section of expressway proposed to be constructed between U.S. Highway 15–501 and Interstate 85.

NCDOT, and the City of Durham executed the Final Mitigation Plan in a public ceremony.

The Final Mitigation Plan recites that the Crest Street Community Council, Inc. "agreed to withdraw its administrative complaint if the City and NCDOT agreed to implement these mitigation efforts," and that plaintiffs agreed to support dissolution of the injunction in the *ECOS* case. In return for allowing construction of the freeway extension to proceed, plaintiffs were accorded substantial relief under the terms of the Plan. The Plan sets out in a comprehensive fashion steps that the City and NCDOT agreed to take to mitigate the detrimental impact of the freeway on the Crest Street community. The defendants moved the proposed highway right-of-way and modified an interchange so as to preserve the community church and park. Plaintiffs state that defendants estimated the cost of implementing their major direct responsibilities under the Plan to be $3,072,000, and as part of the settlement NCDOT released the City of Durham from its obligation to pay an estimated $2,750,-000 towards right-of-way costs for the freeway. A new community site will be developed in the same area and will allow the residents to remain intact as a community, and the quality of the housing, streets, and recreational facilities in the new community will be much better than conditions in the existing community.

The Plan recited that the City and NCDOT denied any liability for plaintiffs' attorney's fees, and that plaintiffs preserved their right to claim such fees. In August 1983, plaintiffs' counsel sent defendants a detailed request for attorney's fees. NCDOT adhered to its position that it was not liable for such fees, and plaintiffs filed this action on November 30, 1983. The parties filed cross-motions for summary judgment, and on November 29, 1984, the district court granted defendants' motion and dismissed the action. 598 F.Supp. 258 (M.D.N.C.1984).

The district court first separated the hours that plaintiffs' counsel worked into those connected with the administrative and the *ECOS* proceedings. It concluded that the 1,224.25 hours worked before the motion to intervene could not be attributed to the *ECOS* action because "to retroactively declare that efforts done over a five year period would have been required in the course of litigation later initiated would result in a highly speculative, uncertain, and unfairly surprising award of fees." *Id.* at 263. The district court then held that § 1988 does not authorize an award of attorney's fees for administrative proceedings to enforce Title VI, and that plaintiffs could not recover any fees incident to the *ECOS* litigation because they were not prevailing Title VI parties in that action. *Id.* at 263–67. Plaintiffs appealed.

## II.

 The Civil Rights Attorney's Fees Awards Act of 1976 added the following sentence to 42 U.S.C. § 1988, which previously had no provision for such fees:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

We think that the wording of § 1988 explicitly covers plaintiffs' claim: They were "prevailing parties" in a "proceeding to enforce ... title VI of the Civil Rights Act of 1964."

If we approach the statutory language in reverse order, the threshold requirement for this and other similar statutes is that the attorney's fees claimant be a "prevailing party, other than the United States." Defendants concede that plaintiffs gained substantial relief that was causally related to their administrative complaint and that plaintiffs therefore are "prevailing parties." [7]

**7.** Although the precise amount and reasonable- ness of plaintiffs' requested fees will be subject

The next statutory requirement is that the underlying legal complaint have been brought in an "action or proceeding to enforce a provision of" one of the listed laws. Defendants argue that plaintiffs' administrative complaint was not an "action or proceeding" within the meaning of § 1988. The natural or usual meaning of the words "action or proceeding" connotes "civil" action and "administrative" proceeding. Of course, "proceeding" alone may be read broadly enough to include "civil" action. We see no reason to depart from those meanings here. Some of the substantive provisions listed in § 1988 explicitly contemplate civil actions in state or federal court, and some, such as Title VI, explicitly contemplate initial administrative proceedings with possible later judicial review. *E.g.,* 42 U.S.C. §§ 2000d–1, 2000d–2. We think that the disjunctive use of both terms indicates on the face of the statute Congress' intent to award fees for both avenues of legal redress to challenged action.

Title VII contains a nearly identical fee provision,[8] and the Supreme Court has repeatedly noted that "the provision for counsel fees in § 1988 was patterned upon the attorney's fees provisions contained in Titles II and VII of the Civil Rights Act of 1964," and that "the legislative history of § 1988 indicates that Congress intended that 'the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act.'" *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40

(1983) (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 4 (1976), U.S.Code Cong. & Admin.News 1976, 5908). In *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980), the Court addressed the same interpretation argument that defendants make here and held that Title VII does authorize a fee award for work done in state administrative and judicial proceedings:

> The words of [the statute] leave little doubt that fee awards are authorized for legal work done in "proceedings" other than court actions. Congress' use of the broadly inclusive disjunctive phrase "action or proceeding" indicates an intent to subject the losing party to an award of attorney's fees and costs that includes expenses incurred for administrative proceedings.... It cannot be assumed that the words "or proceeding" in § 706(k) are mere surplusage.

447 U.S. at 61, 100 S.Ct. at 2029. We think that the same reasoning applies to § 1988. Moreover, Congress' expressed policy of uniformity among the fee statutes will be furthered by adopting the same construction of identical language.

Plaintiffs' "proceeding" before DOT meets the further qualification that it be "to enforce a provision of" one of the listed laws. Title VI is one of those listed statutes, and plaintiffs' primary[9] claim in the administrative complaint was that the proposed highway extension would violate Title VI. Moreover, the purpose of the regulations under which plaintiffs filed their

---

to negotiations between the parties and if necessary to the district court's discretion, we see no reason categorically to exclude the time spent in preparing the motion to intervene or otherwise spent in the *ECOS* proceedings. *Cf. Chrapliwy v. Uniroyal,* 670 F.2d 760, 765–67 (7 Cir.1982) (Title VII plaintiff may recover attorney's fees for optional, collateral federal administrative proceeding that aided ultimate settlement of dispute), *cert. denied,* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Plaintiffs' participation in the *ECOS* action was part of their overall strategy, and whether or not it alone was a catalyst to the relief they obtained, the facts and plaintiffs' theories in the *ECOS* action were intimately connected with their administrative complaint.

**8.** In any action or proceeding under this title the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 2000e–5(k).

**9.** Plaintiffs included several other claims, *see* note 2 *supra,* but the bulk of their discussion in the administrative complaint concerned racial discrimination. The Title VI claim is what generated DOT's investigation and preliminary finding of discrimination and what prevented defendants from proceeding with their plans. The record does not indicate what, if anything, became of plaintiffs' non-Title VI claims.

administrative complaint "is to effectuate the provisions of Title VI of the Civil Rights Act of 1964," 49 C.F.R. § 21.1, so we have no hesitancy in concluding that plaintiffs meet the literal terms of § 1988.

Defendants argue that we should make "no distinction whether the administrative proceeding in question is or is not to enforce Title VI but only whether it is mandatory." Thus, a mandatory proceeding would be an "action or proceeding" "to enforce a provision of" Title VI, but an optional proceeding would not fall within that same definition. Other courts have attributed some significance to the optional/mandatory distinction, but we are not persuaded that it should control for Title VI, and therefore we need not address the district court's conclusion, which both sides accept, that Title VI does not require exhaustion of administrative remedies. *See* 598 F.Supp. at 262 (citing *Chowdhury v. Reading Hospital and Medical Center,* 677 F.2d 317 (3 Cir.1982), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983)).

As we have said, the language of § 1988 provides broadly that "in *any* action *or proceeding to enforce a provision of . . . Title VI* . . ., the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs,"

42 U.S.C. § 1988 (emphasis added), and the scheme of Title VI confirms what the language of § 1988 suggests. The Department of Transportation regulations under which plaintiffs filed their administrative complaint were specifically established to enforce federal rights created by Title VI,[10] so we conclude as a matter of normal statutory interpretation that Congress meant to include them within § 1988's use of the term "proceeding." Moreover, Title VI does not explicitly authorize a private right of action,[11] but it does authorize judicial review of agency action taken to effectuate its purposes. 42 U.S.C. § 2000d–2. The federal[12] administrative proceedings for which plaintiffs seek compensation thus may be analogized to the mandatory state procedures in *Carey:* They are the primary and perhaps the only remedy for violation of that title.[13]

Since the meaning of § 1988 seems so clear on its face, resort to legislative history or policies is hardly required. We note, however, that they confirm our interpretation of § 1988. The legislative history of Title VI does contain numerous references to "suits," "courts," and "judicial process," but these are references only to the usual method of enforcing most of the civil rights statutes listed in § 1988. Certainly there is no affirmative indication that Congress meant to nullify the term "proceeding"

---

**10.** Title VI directed all federal agencies "to effectuate the provisions of section 2000d of this title . . . by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d–1. DOT did issue such regulations, which are titled in part "Effectuation of Title VI of the Civil Rights Act of 1964" and whose stated purpose is "to effectuate the provisions of Title VI." 4 C.F.R. § 21.1 (1984).

**11.** In *Sumpter v. Harper,* 683 F.2d 106, 109 n. 4 (4 Cir.1982), we rejected a specific private claim under Title VI but reserved "the broader question of whether *any* right of action is available to a private litigant under [Title VI]." (original emphasis). We similarly express no opinion on the latter issue.

**12.** The Court in *Carey* rejected the argument that "proceeding" under Title VII should be limited to *federal* administrative proceedings, but acknowledged that such an interpretation "at least would not render the words 'or proceeding' a complete nullity." 447 U.S. at 62, 100 S.Ct. at 2030. We do not adopt such an interpretation

independently, but we recognize that as a practical matter our analysis may lead to that result under Title VI. That title applies to "any program or activity receiving Federal financial assistance," and, while it is certainly possible for the states to have administrative procedures that may be able to redress alleged violations of Title VI, those procedures are not mandated by Congress and presumably they can fare no better than the state-created procedures in *Webb.* *See* Section IV *infra.*

**13.** *Cf.* S.Rep. No. 1011, 94th Cong., 2d Sess. 5, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913 (hereinafter cited as "Senate Report") ("[T]he Committee has found that fee awards are essential if the Federal statutes to which [§ 1988] applies are to be fully enforced. We find that the effects of such fee awards are ancillary and incident to securing compliance with these laws, and that fee awards are an integral part of the remedies necessary to obtain such compliance.").

that it used in § 1988. To the contrary, we believe that the expressed purposes "to remedy anomalous gaps in our civil rights laws ... and to achieve consistency in our civil rights laws," Senate Report, *supra* note 13, at 1, the explicit references to Title VII, *id.* at 2, 3, 4, and the renewed instruction to "the courts to use the broadest and most effective remedies available to achieve the goals of our civil rights laws," *id.* at 3, U.S.Code Cong. & Admin.News 1976, 5909, 5910, all support our conclusion.

### III.

So far as we are aware, only the Third Circuit has considered the precise question before us, i.e., the propriety of awarding attorney's fees under § 1988 for work done in connection with administrative proceedings to enforce Title VI. In *NAACP v. Wilmington Medical Center, Inc.,* 689 F.2d 1161, 1170–71 (3 Cir.1982), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983), the Third Circuit held that prevailing plaintiffs could recover attorney's fees for work related to an administrative proceeding to which they were not parties but which was prompted by the litigation so long as that work contributed to their ultimate success. The court relied simply on the language of the statute and the Supreme Court's reasoning in *Carey.*

In *Latino Project, Inc. v. City of Camden,* 701 F.2d 262 (3 Cir.1983), a different panel of the Third Circuit distinguished *Wilmington Medical Center* on the ground that plaintiffs in that case had initially filed a complaint in district court, while the plaintiffs in *Latino Project* had succeeded, if at all,[14] at the administrative level without ever filing suit in court. The *Latino Project* panel held that "a plaintiff who has not filed a civil complaint on the

merits of a claim under one of the civil rights statutes enumerated in [§ 1988] is not entitled to attorney's fees ..., even though he may have obtained substantial relief in an administrative proceeding." *Id.* at 265. We respectfully doubt the correctness of that holding,[15] but in any event, ours is not that case. In the case before us, there was intervention in a case pending in court, and for all practical purposes, intervention was permitted.

### IV.

Defendants contend that the reasoning in *Webb v. Board of Education of Dyer County,* 471 U.S. ——, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985), and other non-Title VI cases compels a conclusion different from what the face of the statute indicates. We disagree. The petitioner in *Webb* was a black man who was fired from his position as a tenured public elementary school teacher. He obtained counsel and challenged his discharge at several hearings before the county board of education on the grounds that the discharge was racially motivated, that it violated his right to due process, and that it violated state laws governing teachers' dismissals. He was unsuccessful before the board, so he filed a complaint in federal district court, alleging that his rights under the Constitution and 42 U.S.C. §§ 1981, 1982, 1983, and 1985 had been violated. The parties settled the federal suit by agreeing that Webb would be reinstated and awarded $15,400 in damages. Upon litigation of the attorney's fees issue, the board conceded that Webb was a prevailing party, but it contended that the fee should be no more than $5,000, rather than the $21,165 requested. The district court ruled in Webb's favor on all issues except his claim for fees before the

---

**14.** Plaintiffs in *Latino Project* challenged a municipality's administration of block grant funds, and the HUD area supervisor concluded that the city had not discriminated in using those funds. Plaintiffs took no further legal action, other than seeking their attorney's fees in district court.

**15.** It is perhaps significant that the *Latino Project* panel began its "analysis of section 1988

by noting the ambiguity of the words '*civil* action or proceeding,'" *id.* at 263 (emphasis added). This was a misquotation of the language of § 1988, and *Latino Project* uniformly misquotes § 1988 by adding the word "civil" before "action or proceeding." It is possible that the correctness of the conclusion which we doubt is attributable to this initial and repeated error.

state tribunals, and it awarded a fee of $9,734.38 plus expenses.

Webb argued on appeal (1) that the school board hearings were "proceeding[s] to enforce a provision of [§ 1983]" within the meaning of § 1988, and (2) that the time spent in those hearings was nevertheless compensable as reasonably spent in preparation for the court action. On the first point, the Court noted the similarity between § 706(k) of Title VII and § 1988, but it stated that "the reasoning in Carey is not applicable to this case," because § 1983 contains no exhaustion requirement, as Title VII does,[16] and because "the school board proceedings in this case simply do not have the same integral function under § 1983 that state administrative proceedings have under Title VII." 471 U.S. at ——, 105 S.Ct. at 1927–28, 85 L.Ed.2d at 240–41. The Court stated:

> Congress only authorized the district courts to allow the prevailing party a reasonable attorney's fee in an "action or proceeding to enforce [§ 1983]." Administrative proceedings established to enforce tenure rights created by state law simply are not any part of the proceedings to enforce § 1983, and even though the petitioner obtained relief from his dismissal in the later civil rights action,

he is not automatically entitled to claim attorney's fees for time spent in the administrative process on this theory.

*Id.* 471 U.S. at ——, 105 S.Ct. at 1928, 85 L.Ed.2d at 241 (footnotes omitted).

The Court in *Webb* then went on to consider petitioner's second theory—that even if there was no automatic entitlement for the time spent on the administrative proceedings, that time was reasonably expended in preparation for the later litigation. It emphasized that each case must be decided on its own facts, and that although some services performed before formally filing a lawsuit are compensable under § 1988, it was not error for the district court to exclude the five years of easily separable administrative time in computing a "reasonable attorney's fee" for Webb's counsel. *Id.* 471 U.S. at ——, 105 S.Ct. at 1927–29, 85 L.Ed.2d at 241–43.[17]

■ What we find most significant about *Webb* is not that it denied an increase in fees to a prevailing § 1983 plaintiff, but that it did so on a basis that did not categorically exclude administrative proceedings from § 1988. We deem this an indication that in an appropriate case such fees may be recoverable,[18] and we believe that

---

**16.** The Court said:

> Carey, however, arose under a statute that expressly requires the claimant to pursue available state remedies before commencing proceedings in a federal forum. There is no comparable requirement in § 1983, and therefore the reasoning in Carey is not applicable to this case....
>
> The difference between Carey and this case is that in Carey the statute that authorized fees, Title VII, also required a plaintiff to pursue available state administrative remedies. In contrast, nothing in § 1983 requires that a plaintiff exhaust his administrative remedies before bringing a § 1983 suit.

471 U.S. at ——, 105 S.Ct. at 1927, 85 L.Ed.2d at 240–41 (footnote omitted) (quoting *Smith v. Robinson,* 468 U.S. ——, —— n. 14, 104 S.Ct. 3457, 3469 n. 14, 82 L.Ed.2d 746, 764 n. 14 (1984)).

**17.** The Court concluded:

> "We reemphasize that the district court has discretion in determining the amount of a fee award." [*Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)]. When such an award is appealed,

the reviewing court must evaluate its reasonableness with appropriate deference. Considering the governing legal principles, the petitioner's burden of establishing his entitlement to the requested fee, and the evidence and arguments presented below, we conclude that the District Court's decision to deny any fees for time spent pursuing optional administrative remedies was well within the range of reasonable discretion.

471 U.S. at ——, 105 S.Ct. at 1929, 85 L.Ed.2d at 243.

**18.** *See id.* 471 U.S. at ——, 105 S.Ct. at 1929–35, 85 L.Ed.2d at 243–49 (Brennan, J., concurring in part and dissenting in part) (Court's conclusion authorizes limited awards of fees under § 1988 for work performed in optional state administrative proceedings); *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 762 F.2d 272, 277 n. 7 (3 Cir.1985) ("[T]he Supreme Court recently held in *Webb* ... that fees may be recovered under 42 U.S.C. § 1988 for time spent by counsel pursuing 'optional administrative proceedings,' ... so long as counsel's work 'was both useful and of a type ordinarily

*Webb*'s reasoning further suggests that this is such an appropriate case. In all three of the most pertinent Supreme Court cases—*Carey, Smith,* and *Webb*—the Court applied the attorney's fees statutes as written but examined the congressional enforcement scheme for the underlying rights involved to see if the particular proceedings for which fees were sought were part of those statutory schemes. The Court has concluded that certain state administrative proceedings do qualify under Title VII and that mandatory Education of the Handicapped Act and optional state tenure proceedings do not qualify under §§ 1983 and 1988. We believe that each provision listed in § 1988 must be examined separately, *cf. Redd v. Lambert,* 674 F.2d 1032, 1036–37 (5 Cir.1982) (disallowing fees for plaintiff whose § 1983 claim was not decided by the state courts but carefully distinguishing 28 U.S.C. § 1341 from Title VII and *Carey* on the basis of § 1341's remedial scheme), and that the enforcement scheme of Title VI aligns it solidly with Title VII rather than with § 1983. Resort to optional administrative proceedings that are creatures of state law cannot be linked to the congressional enforcement scheme under § 1983, so there is no apparent basis to infer that Congress intended to include them within § 1988 when it drafted that statute. In contrast, mandatory state procedures under Title VII and certain federal procedures under Title VI are important parts of the statutory enforcement scheme. As we discussed above, the proceedings that plaintiffs initiated here certainly serve an "integral function," *Webb,* 471 U.S. at ——, 105 S.Ct. at 1927, 85 L.Ed.2d at 241, under Title VI.

## V.

Since we hold that plaintiffs' claim is explicitly covered by the language of § 1988, we consider next whether they may bring an independent action in federal district court solely to recover fees for an administrative complaint that has already

necessary to advance the [civil rights] litigation'

been settled. Section 1988 provides that *"the court,* in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," and DOT's regulations implementing Title VI contain no provision for awarding attorney's fees. Thus, it follows that plaintiffs *must* apply to a court for their fees.

There is authoritative support for our reading that prevailing Title VI plaintiffs may bring an independent action in federal court to recover attorney's fees. Title VI's enforcement scheme is similar to Title VII's in that they both rely heavily on administrative proceedings in the first instance. The Supreme Court stated in *Carey* that there were no insurmountable barriers to recognition of such an independent action under Title VII:

> We agree with the District Court that the availability of a federal fee award for work done in state proceedings following EEOC referral and deferral should not depend upon whether the complainant ultimately finds it necessary to sue in federal court to obtain relief other than attorney's fees. But our agreement with the District Court compels us to reject its conclusion. It would be anomalous to award fees to the complainant who is unsuccessful or only partially successful in obtaining state or local remedies, but to deny an award to the complainant who is successful in fulfilling Congress' plan that federal policies be vindicated at the state or local level. Since it is clear that Congress intended to authorize fee awards for work done in administrative proceedings, we must conclude that § 706(f)(1)'s authorization of a civil suit in federal court encompasses a suit solely to obtain an award of attorney's fees for legal work done in state and local proceedings.

447 U.S. at 65–66, 100 S.Ct. at 2032. We believe the same anomalous consequences would result here if we were to deny fees solely because plaintiffs resolved their dispute without court action, as Title VI and

to the point where the party prevailed.").

its implementing regulations encouraged them to do.

■ Some cases have stated that § 1988 does not create an independent cause of action, but the district court correctly distinguished these as having been decided before, or relying on reasoning that does not apply after, the 1976 amendment to § 1988 that added the attorney's fee provision at issue here. 598 F.Supp. at 262. The two cases defendants cite, *Estes v. Tuscaloosa County*, 696 F.2d 898 (11 Cir. 1983), and *Horacek v. Thone*, 710 F.2d 496 (8 Cir.1983), may also be distinguished on the ground that the attorney's fees sought in those cases were incurred in state administrative proceedings that did not concern enforcement of the civil rights statutes. Section 1988 clearly does not apply and does not create an independent cause of action in such circumstances.

■ Even if some type of court action were required to trigger § 1988's fee provision, plaintiffs would still have a claim to fees by virtue of their proposed complaint and motion to intervene in the *ECOS* action. That motion was never formally granted or denied, but the defendants in that action recognized plaintiffs' status by including them in the consent settlement. Indeed, the fact that the consent judgment was not filed until the Final Mitigation Plan had been fully negotiated and only one day before the Plan's formal execution suggests that plaintiffs were the controlling force in final settlement of the *ECOS* action. Plaintiffs were in a comparable position to a plaintiff whose suit is settled after merely filing a complaint,[19] and we think such a party would also be considered

sufficiently prevailing in a civil "action" to merit an award of attorney's fees.

## VI.

To summarize, we hold that plaintiffs who prevailed on their Title VI claim at the administrative level may recover their attorney's fees and costs for work performed in connection with those proceedings[20] in an independent action in federal district court. Therefore, we reverse the judgment of the district court and remand for determination of a reasonable fee.

**REVERSED AND REMANDED.**

---

19. The legislative history of § 1988 supports our conclusion. *Cf.* Senate Report, *supra* note 13, at 4 n. 4, U.S.Code Cong. & Admin.News 1976, at 5912 n. 4 ("In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs and/or plaintiff-intervenors."); *id.* at 5, U.S.Code Cong. & Admin. News 1976, at 5912 ("Moreover, for purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief."); H.R.Rep. No. 1558,

94th Cong., 2d Sess. 7 (1976) (a court should still award fees when a defendant voluntarily ceases the unlawful practice after a complaint is filed); *see also Carey, supra* (federal suit dismissed after complaint, answer, and one pretrial conference).

20. We consider the proceedings in the district court and on this appeal as connected to plaintiffs' underlying Title VI claim. Plaintiffs may properly request payment for them.