**Eliana MARTINEZ, By and Through her next friend, Rosa E. MARTINEZ, her mother, Plaintiff,**

v.

**The SCHOOL BOARD OF HILLSBOROUGH COUNTY, FLORIDA, Defendant.**

No. 87–1308–CIV–T–17(A).

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 8, 1988.

Stephen F. Hanlon, Barnett, Bolt & Kirkwood, Tampa, Fla., for plaintiff.

W. Crosby Few, and Thomas M. Gonzalez, Thompson, Sizemore & Gonzalez, Tampa, Fla., for defendant.

## MEMORANDUM OPINION

KOVACHEVICH, District Judge.

This matter came on for trial on July 13 and 14, 1988, before this Court sitting without a jury.

## HISTORY OF THE CASE

The complaint in this cause was filed September 3, 1987, and made the following allegations: 1) violation of Plaintiff's right to a free and appropriate education pursuant to 20 U.S.C. § 1401, 2) deprivation of Plaintiff's right to a free and appropriate education in the "least restrictive environment" pursuant to section 504 of the Rehabilitation Act of 1973, and 3) deprivation of Plaintiff's right to a free and appropriate education in the "least restrictive environment" pursuant to the equal protection clause of the Fourteenth Amendment to the United States Constitution.

On September 10 and 21, 1987, the Court denied Plaintiff's motion and renewed motion for expedited trial. Subsequently, Plaintiff filed a motion for preliminary injunction and a hearing on that motion was held November 6, 1987. On December 23, 1987, the Court denied the motion for preliminary injunction, finding that the specific potential harm to the public, and specifically the population of the trainable mentally handicapped (TMH) classroom, outweighed the harm possible to Plaintiff and that Plaintiff had not carried the burden of establishing the likelihood of prevailing on the merits.

## JURISDICTION AND VENUE

1. This action arises under section 504 of the Rehabilitation Act of 1973; 20 U.S.C. §§ 1400, et seq., and the Constitution of the United States. The Court is vested with jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3).

2. Venue lies in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Rule 1.02, Rules of the United States District Court for the Middle District of Florida.

## PARTIES

1. Plaintiff is Eliana Martinez, born September 15, 1981; she is the adopted child of Rosa E. Martinez. Plaintiff resides in Hillsborough County, Florida, with Rosa E. Martinez.

2. Defendant School Board of Hillsborough County, Florida is a public entity organized under the laws of the State of Florida and is the governing body of the public school system in Hillsborough County, Florida. The School Board is empowered and charged with the duty of providing a free and appropriate education, in the least restrictive environment applicable to individual circumstances, to all children living in Hillsborough County, including Plaintiff.

After consideration of the testimony, exhibits, pre-trial and post-trial pleadings, and current compilations of AIDS research and reporting of which the Court takes judicial notice, the Court makes the following findings of fact and conclusions of law. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent any conclusion of law constitutes a finding of fact, they are adopted as such.

## FINDINGS OF FACT

### ACQUIRED IMMUNODEFICIENCY SYNDROME

1. The first cases of the disease now known as Acquired Immunodeficiency Syndrome (hereafter AIDS) were reported to the Public Health Service's Centers for Disease Control (hereafter CDC) in 1981, although it may have appeared in this county as early as 1969. *AIDS in Correctional Facilities: Issues and Options*, 3rd Edition, April 1988 (U.S. Department of Justice, National Institute for Justice) (hereafter NIJ Report). The CDC is the central repository for AIDS reporting and research in the United States.

2. By the end of 1987 about fifty thousand (50,000) people in this country had been diagnosed as having AIDS, and, about twenty-eight thousand (28,000) had died. (Joint Ex. 5). There have been over seven

hundred (700) reported pediatric cases. As of April, 1987 seventy-two percent (72%) of the pediatric AIDS patients in the United States were reported from Florida, with most of those cases in South Florida, New Jersey, and New York. (Def. Ex. 3). It has been estimated that from 1 to 1.5 million persons in the United States are infected with human immunodeficiency virus (hereafter HIV or HTLV–III or HTLV–III/LAV) and there are between fifty and one hundred twenty-five thousand (50,000–125,100) cases of AIDS related complex (hereafter ARC). (Joint Ex. 5 and NIJ Report).

3. Current medical research postulates that AIDS is caused by infection with HIV, a human retrovirus, distinguished from other viruses by chromosome structure and mode of replication. A retrovirus invades and incorporates itself into the genetic material; it flows from RNA to DNA, thus reversing the normal flow of genetic messages. (NIJ Report).

4. When the virus enters the body it begins to attack certain white blood cells (T-lymphocytes or T4 cells), which are an integral part of the human immune system. Specifically, the disease destroys, and generates qualitative abnormalities, in the victim's T-helper/inducer cells, which enable other components of the immune system to function. The virus thereby weakens the victim's immune system.

5. AIDS is not a single disease process and several categories are employed in discussing the disease. The earliest indications of HIV infection are detection of antibodies to the virus in the blood or the actual isolation of the HIV in the blood. The appearance of antibodies is known as seroconversion and can be detected before noticeable immunological damage manifests. As stated previously, there may be as many as 1.5 million people in this country who are seropositive or HIV infected, but who have developed no symptoms of the disease yet.

6. Presently it is not known with any certainty what percentage of this population will ever develop any symptomology or ultimately develop clinical AIDS. The CDC has estimated that by the end of 1991 two hundred seventy thousand (270,000) cases will have been diagnosed in the United States and that the total number of deaths attributed to AIDS will be about one hundred seventy-nine thousand (179,000). (Joint Ex. 5). However, even if a HIV infected individual never develops any further manifestation of the disease, that individual is a carrier and is capable of transmitting the infection to others who may progress in the disease continuum. Assumably this capacity for transmission is continuous throughout the life of the carrier. (NIJ Report).

7. An essential element of making a diagnosis of AIDS has been the affliction of one or more opportunistic diseases in the immune compromised individual, but which are not generally seen in persons with normal immune systems. In August 1987, the CDC revised the definition of AIDS used for reporting purposes. The new definition is comprised of three (3) sections depending on the status of laboratory evidence of HIV infection.

The major proposed changes apply to patients with laboratory evidence for HIV infection: a) inclusion of HIV encephalopathy, HIV wasting syndrome, and a broader range of specific AIDS-indicative diseases; b) inclusion of AIDS patients whose indicator diseases are diagnosed presumptively; and c) elimination of exclusions due to other causes of immunodeficiency.

Application of the definition for children differs from that for adults in two ways. First, multiple or recurrent serious bacterial infections and lymphoid interstitial pneumonia/pulmonary lymphoid hyperplasia are accepted as indicative of AIDS among children but not among adults. Second, for children less than 15 months of age whose mothers are thought to have had HIV infection during the child's perinatal period, the laboratory criteria for HIV infection are more stringent, since the presence of HIV antibody in the child is, by itself, insufficient evidence for HIV infection because of the persistence of passively acquired maternal anti-

bodies less than 15 months after birth. (CDC MMWR Supplement 8–14–87).

8. The CDC's definition of AIDS has led to the unofficial, but widely used, definitional classification known as AIDS–related complex (ARC). ARC is generally the manifestation of any two symptoms, from a long list of symptoms, including swollen lymph nodes, weight loss, and night sweats, and any two from a list of laboratory abnormalities, including blood tests showing depressed T-cell helpers and helper/suppressor ratio. (National Health Institute's (hereafter NIH) definition of ARC).

9. The general medical opinion at this time is that it is unlikely that an effective vaccine will be ready before the next decade. (Joint Ex. 5). At this time, there is not any acknowledged safe and completely effective treatment and the prospects of a total cure does not appear to be likely in the foreseeable future. Due to the lack of cure or vaccine, the weapon which must be employed against this disease is prevention through education.

10. There are several identified risk groups for AIDS: 1) homosexual or bisexual men, 2) intravenous (IV) drug users, 3) sexual partners of risk-group members, 4) transfusion recipients, 5) hemophiliac recipients of blood products, and 5) children born to infected mothers. The following chart represents the apportionment of risk factors in 31, 381 AIDS patients in the United States as of March 2, 1987 (Def. Ex. 3):

| | Male 93% | Female 7% | Total |
|---|---|---|---|
| Homosexual or bisexual men (Non–IV drug users) | 70% | —— | 65% |
| Homosexual or bisexual men (IV drug users) | 8% | —— | 8% |
| Heterosexual IV drug users | 15% | 51% | 17% |
| Heterosexual partners of persons with AIDS | 2% | 27% | 4% |
| Coagulation disorders | 1% | 1% | 1% |
| Other transfused patients | 1% | 10% | 2% |
| Undetermined risk factor | 3% | 11% | 3% |
| | 100% | 100% | 100% |

11. The known routes of HIV transmission, and the primary routes, are sexual intercourse, infusion or inoculation of blood, and perinatal events. There is at least one case in which it appears transmission occurred from mother to child through ingestion of breast milk.

12. The medical consensus is that the AIDS virus is difficult to transmit and is very fragile outside the human body. The virus is susceptible to heat, common household disinfectants and detergents. (NIJ Report).

13. Varying amounts of the HIV virus have been isolated in the following body fluids: blood, semen, vaginal fluid, saliva, tears, breast milk, and urine. The risk of transmission from these bodily secretions varies. Blood, semen, vaginal fluid, and breast milk are proven routes for transmission and universal precautions are recommended for the prevention of transmission in dealing with these fluids. (Joint Ex. 13).

14. The transmissibility from the remaining body secretions, that is saliva, tears, and urine, is at this time a negative. There are no cases, to date, in which the route of transmission has been proven to be through one of these secretions. The general consensus seems to be that the possibility of transmission through these medium is a "remote theoretical possibility."

15. The updated CDC guidelines for health care workers, published June 24, 1988, states that universal precautions do not apply to feces, nasal secretions, sputum, sweat, tears, urine, and vomitus unless they contain visible blood. (Joint Ex. 13). But in the January 29, 1988, CDC publication "Guidelines for Effective School Health Education to Prevent the Spread of AIDS", the CDC stated:

Although no transmission from deep, open-mouth (i.e. "French") kissing has been documented, such kissing theoretically could transmit HIV from an infected to an uninfected person through direct exposure of mucous membranes to infected blood or saliva. (Joint Ex. 5).

16. Extensive and numerous studies have consistently found no apparent risk of HIV infection by individuals exposed through close, non-sexual contact with AIDS patients. These studies have demon-

strated that contacts involving sharing of household items, such as toothbrushes, eating utensils, and baths or toilets, do not lead to HIV–infection. Similarly, there is no evidence that close personal, but non-sexual interaction, such as giving a bath, shaking hands, or kissing on the lips, will cause HIV–infection. (*AIDS: The Facts*, American Red Cross).

17. The CDC, the American Academy of Pediatrics, and other medical groups have developed recommended guidelines concerning school attendance for children infected with the HIV antibody. (*AIDS: Recommendations and Guidelines*, Center for Disease Control, November 1982– November 1986; *Report of the Committee on Infectious Diseases*, American Academy of Pediatrics, 1986; *AIDS and Children*, American Red Cross, October 1986; and *Surgeon General Workshop on Children with HIV Infection and Their Families*, April 6 through 8, 1987). The Court notes that although the CDC has updated and changed the guidelines for health care workers, to date no changes in the guidelines relating to children and school attendance have be issued by the CDC or the American Academy of Pediatrics.

18. The following constitute the recommendations of the American Academy of Pediatrics:

a. Most school-aged children and adolescents infected with HIV–III should be allowed to attend school without restrictions and with the approval of the child's physician. Based on present data the benefits of unrestricted school attendance of these children outweigh the possibility that they will transmit the infection in the school environment.

b. Some infected students may pose an increased risk to others in school. Students *who lack control of their body secretion,* who display behavior such as biting, or who have open skin sores which cannot be covered require a more restricted school environment until more is known about the transmission of the virus in these circumstances. Arrangements for special education should be made for children who are unable to attend regular classes. (Emphasis supplied).

c. School districts should identify individuals, including the child's physician, who have the qualifications to evaluate whether or not an infected child poses a risk to others. Assessment of the need for educational alternatives to regular school should be performed regularly. Hygienic practices of an infected student may improve with maturation or deteriorate if the condition worsens. If a risk is determined to exist, the child should be removed from the classroom and an appropriate alternative education program established until a subsequent review determines that the risk is abated. At the time a decision is made to exclude a child from school, a plan for periodic review should be established.

d. The number of personnel aware of the child's condition should be kept to the minimum needed to assure proper care of the child and to identify situations where the potential for transmission may be increased. Persons involved in the care and education of an infected student must respect the student's right to privacy. Confidential records should be maintained.

e. All schools should adopt routine procedures for handling blood or body fluids, including the disposal of sanitary napkins, regardless of whether or not students with HTLV–III infection are known to be in attendance. School health care workers, teachers, administrators, and other employees should be educated about procedures which have been established by local codes. For example, soiled surfaces should be promptly cleaned with disinfectants, such as household bleach, diluted 1 part bleach to 10 parts water. Persons involved in cleaning contaminated surfaces should avoid exposure to open skin lesions or mucous membranes to blood or body fluids.

f. Children infected with HTLV–III may develop immunodeficiency, which increases their risks of experiencing severe complications from infections such as chickenpox, tuberculosis, measles, cyto-

megalovirus and herpes simplex virus. Those known to be infected should be excused from regulations which mandate live vaccines as a condition for school attendance. The child's physician regularly should assess the risk of an unrestricted environment on the health of the HTLV–III–infected student.

g. Routine screening of children for HTLV–III infection is not recommended.

19. The recommendations promulgated by other medical groups are consistent with those quoted above. The CDC additionally recommends the following:

a. Decisions regarding the type of educational and care setting for HTLV–III/LAV-infected children should be based on the behavior, neurologic development, and physical condition of the child and the expected type of interaction with others in that setting. These decisions are best made using the team approach including the child's physician, public health personnel, the child's parent or guardian, and personnel associated with the proposed care or educational setting. In each case, risks and benefits to both the infected child and to others in the setting should be weighed.

b. All educational and public health departments, regardless of whether HTLV–III/LAV-infected children are involved, are strongly encouraged to inform parents, children, and educators regarding HTLV–III/LAV and its transmission. Such education would greatly assist efforts to provide the best care and education for infected children while minimizing the risk of transmission to others.

## FACTS PERTAINING TO THIS CASE

1. Eliana Martinez born in Puerto Rico, was born prematurely, on September 15, 1981, with respiratory distress. Eliana received thirty-nine (39) blood transfusions in the first four (4) months of life.

2. On August 9, 1982, Eliana came to live with Rosa Martinez in Puerto Rico, at the age of one (1) year and the child weighed 10 pounds. Thereafter, on June 14, 1983, Rosa Martinez moved to Tampa, Florida.

3. Eliana has been classified as a Trainably Mentally Handicapped (hereafter TMH) child. The TMH classification pertains to children with an intelligence quotient (IQ) level between twenty-five (25) and fifty (50).

4. In September 1983, Eliana began school at the United Cerebral Palsy of Tampa, where she stayed for one (1) year and attended three (3) or four (4) times a week.

5. In September, 1984, Eliana started attending Tampa Methodist Center, and was there for a couple of months. In or about November, 1984, Eliana began getting ill; her lymph nodes were enlarged and she had skin infections.

6. In December, 1984, Eliana's treating physician admitted her to Tampa General Hospital with a possible diagnosis of AIDS Related Complex; that diagnosis was confirmed in April, 1985.

7. From the time Eliana was adopted until the confirmation of the ARCS diagnosis, Rosa Martinez and the rest of her family did not take any special precautions in caring for Eliana. Rosa Martinez and her family have, to the date of this complaint, tested negative for the HIV virus.

8. In August of 1985, prior to Defendant having knowledge of Eliana, or any other similarly situated child, Defendant began to develop a protocol for the handling of AIDS and ARC children's schooling. On October 22, 1985, Defendant adopted a plan to form an interdisciplinary team that would make recommendations to the School Board as to the educational placement of children with a diagnosis of AIDS or ARC. The members of the team are: 1) the Medical Director of the Hillsborough County Health Department; 2) the Supervisor of School Health Services from the Hillsborough County Health Department; 3) a representative for the upper level of administration from the School Board; 4) the General Director of Education for Exceptional Students for the School Board; and 5) a physician specializing in allergy and immunology. The team

met on December 19, 1985, to formulate their protocol for review.

9. Following the ARC diagnosis, Eliana was placed at the Forest Home Health Agency, albeit with some difficulty in placement, from July, 1985, until December, 1986. At this facility, Eliana received physical, occupational, and speech therapy. In the summer of 1986, Rosa Martinez began the process necessary to enroll Eliana in the public schools of Hillsborough County, Florida. The Court wishes to make it clear that Mrs. Martinez has sought and still seeks placement of her daughter in a TMH classroom, rather than a "mainstream" class.

10. The following facts are relevant to the placement of Eliana Martinez in an educational setting:

a. In the past when Eliana had skin lesions she has been kept at home. Eliana has not had any skin lesions reported in 1988. She has at the time of several hospitalizations had a skin rash noted, possibly in reaction to high fever, but without notation of oozing in connection with the rash.

b. In the past Eliana had a problem with chronic diarrhea. The last time Eliana had a diarrhea problem was three (3) years ago.

c. Eliana is not toilet trained at this time.

d. Eliana does not drool, per se. However, she does mouth her thumb and forefinger frequently, resulting in saliva on the digits.

e. Eliana has the ability to respond to instruction, she can and has learned not to do certain things in response to her instructors.

f. Eliana has not advanced to her verbal potential; she is almost non-verbal, and she has about a fifteen (15) word verbal vocabulary that can be understood in the context of a situation. Eliana is able to use sign language and a computerized picture board for communication.

g. There are no reports that Eliana has bitten or spit at anyone.

h. Eliana, as well as most AIDS patients, suffers from thrush, a disease characterized by whitish spots and ulcers on the membranes of the mouth, fauces, etc., caused by a parasitic fungus, *candida albicans. The Random House College Dictionary*, Revised Edition (1980). It is not uncommon to find blood in the saliva when a patient has lesions in the mouth due to the thrush. Eliana's thrush is persistent, but it is better at times and there are no open lesions.

11. On September 11, 1986, the interdisciplinary team met to review Eliana's request for enrollment in school. All team members were present, as well as Dr. Phillip DeVoe, Eliana's treating physician; Sandra Kilpatrick, the principal of Manhattan School for Exceptional Children; and Rosa Martinez. The team had available to them Eliana's medical records, the guidelines of the CDC and American Academy of Pediatrics, and information from Dr. DeVoe. The team recommended, based on the diagnosis of ARC and the fact that Eliana was incontinent, that Eliana be placed on homebound instruction program and that her case be reviewed every six (6) months. Dr. DeVoe concurred with that decision.

12. On November 18, 1986, the School Board unanimously voted to accept the recommendation of the interdisciplinary team. The interdisciplinary team has reviewed Eliana's situation twice since the original decision, on December 7, 1987 and June 28, 1988. On both occasions, the team recommended that no change in placement be made because she was still incontinent and there had been no changes in the relevant guidelines.

13. Under the provisions of 20 U.S.C. § 1415(f), Plaintiff was required to exhaust certain administrative remedies prior to filing this action. In December, 1986, Plaintiff instituted proceedings in the Division of Administrative Hearings (hereafter DOAH), State of Florida, *Martinez v. Hillsborough County School Board,* Case NO. 86–4571E.

14. A hearing was held on April 14 and 15, 1987, in Tampa, before a DOAH hearing officer. On August 25, 1987, the hearing officer issued a decision upholding the

School Board's decision to place Eliana Martinez in a homebound educational setting, rather than placement in a TMH classroom.

15. Homebound teaching first began for Eliana in October, 1986, and has continued, with some interruptions of some services, until the present. Currently, Eliana is seen by a teacher trained TMH teacher, Peggy Kelly, an occupational therapist, and a speech therapist, for varying amounts of time each week. Each of these teachers testified that in their opinion Eliana would greatly benefit, socially and educationally, from being educated in conjunction with other children so that she could have the advantages of modeling and observation of appropriate behavior of other children.

16. It is agreed by all parties and doctors that Eliana Martinez has now progressed in her illness to having a "full-blown" case of AIDS. The life expectancy of a person with AIDS is not more than two (2) years. Eliana is in the late stages of AIDS, according to Dr. Russell, but has been stabilized at that stage for two or three months.

17. In August of 1987, Eliana was evaluated at the National Cancer Institute, National Institutes of Health (hereafter NIH) for entry into a Phase I study designed to assess the toxicity and efficacy of azidothymidine (hereafter AZT) for children with AIDS or ARC. AZT is a chemical that inhibits multiplication of the HIV virus and has been approved by the Food and Drug Administration for symptomatic adults who have the HIV virus. Before the drug can be approved for children there must be a demonstration of clinical safety and definition of appropriate dosage. This is done in a Phase I trial or study.

18. Dr. Philip Pizzo is the general supervisor of the protocol in which Eliana is participating. Eliana is now, as of June 1988, receiving AZT by a continuous intravenous therapy. It is Dr. Pizzo's testimony that Eliana has improved in various areas since the inception of the AZT treatment. It is Dr. Pizzo's opinion that Eliana should be in a restricted educational environment, to maintain safety, maximize involvement with skilled teacher in a low student/teacher ratio situation.

19. Eliana's last evaluation at NIH was July 11, 1988. The psychological assessment states that Eliana has gained skills and increased her IQ since the treatment started. Her overall functioning is in the moderate range of mental retardation, with a weakness in language (approximately at the two (2) year level) and a strength in visual-perceptual skills (varied up to the four (4) year level). The evaluation further states:

Eleana (sic) would appear to learn best in a small structured classroom with small student-teacher ratio (6 children to 1 teacher and 1 aide) with individual and small group instruction. She needs to continue to develop her receptive language skills as well as learn to spontaneously use the signs she already knows for communication. Her strength in her visual-perceptual skills may be used in a way she enjoys to help her learn new words and concepts (ie. puzzles, matching pictures, sorting objects). Finally Eleana (sic) may benefit from a behavior modification program to reduce her thumb-sucking which interferes with her learning and performance. She manipulates materials better when using both hands and should be encouraged to do so when appropriate. (Joint Ex. 6C).

20. Eliana is also seen at the University of South Florida (hereafter USF) Allergy and Immunology Division. Her direct treating physician at that clinic is Dr. Donald Russell. Dr. Russell succeeded Dr. Joseph Diaz, in that position at USF. Dr. Richard F. Lockey is the supervisor of that division.

21. Dr. Diaz stated that in his opinion Eliana needed to be in a "very strictly supervised, restricted environment" if she is going to school, that she not put anything in her mouth that another child would get, that she not "pee or poop" on the floor, not bite or scratch, and that there be no contact between secretions. Further Dr. Diaz testified that because of the theoretical risk "anything that comes in contact

with her secretions, should be treated as potentially infectious."

22. Dr. Lockey opined that Eliana should not be in a school setting and that the risk was two-fold; to the other children from Eliana, and, to Eliana from the other children.

23. Dr. Russell felt a program could be designed so that Eliana could attend school. He stated it would require that they be set apart at least such a distance between Eliana and the other children to allow for rapid intervention of "any approach" to prevent unpredictable interactions. He felt an aide, teacher, or nurse should be in close proximity to Eliana, to handle her secretions, to protect the other children from an unfortunate approach, and "most especially" to protect Eliana from any child who might be infected with a virus or bacterial agent, known or unknown. Dr. Russell stated that in his opinion the safest way to have Eliana in a classroom is to limit the interaction between her and the other children, to provide as much space as possible between them (between six (6) and eight (8) feet), and that there would have to be a guarantee that there would be no contact between children and no contact between bodily secretions. He said no physician or epidemiologist could honestly stake his life that secretions, with or without blood, can not infect, and, therefore:

> "... you learn early in medical school that one of the best ways out of an argument or out of a jam, an intellectual jam or an academic jam, is to suggest if you don't really have hard evidence to support what you are recommending in a particular case, the easiest way out is to say well, there's no medical evidence to suggest otherwise. But in this case we're dealing with a potentially fatal illness and because of the absence of information, not the presence of information, the requirement is that we err on the side of caution and that's the basis for that recommendation. There also, as you probably have already covered, anecdotal reports which suggest the possibility of transmissibility by other that sexual contact or direct blood-to-blood contact." (trial testimony Dr. Russell).

24. Dr. Kwalick, who had never examined Eliana, is the Director of the County Health Department. Dr. Kwalick opined that Eliana should not be admitted to a TMH classroom, even if the theoretical danger to the other children could be virtually eliminated, due to the danger to Eliana from the other children due to her compromised immune system.

25. The medical records of Eliana Martinez show that she has been hospitalized several times in 1988; she entered Tampa General Hospital (TGH) on January 16, 1988, and was discharged on January 20. The admission diagnosis was fever and possible seizures. On February 28, 1988, Eliana was again admitted to TGH with possible seizures; that admission lasted until approximately March 4, 1988. The cause for the seizure activity was not conclusively established; it may have been a reaction to taking of a prescribed drug called Haldol.

26. On March 8, 1988, just four (4) days later Eliana returned to TGH with an admission diagnosis of probable pnemoystisis pneumonia and suspected HIV encephalopathy, the main complaint on admission was fever. The discharge on this admission was on or about March 26, 1988.

27. The last admission to TGH, prior to the trial of July 13, was on April 25, 1988, with a chief complaint of fever. Discharge occurred on May 3, 1988.

28. An Individual Educational Program (IEP) is required to be developed for all exceptional students. The IEP addresses educational goals and needs for a student for a year. Eliana's IEP provides for one hour per day of instruction from a certified teacher and two hours per week of occupational and physical therapy.

29. Plaintiff seeks to be admitted to a TMH classroom at Manhattan School for Exceptional Students. There is currently one (1) class of TMH students at that school in Eliana's age group; that classroom currently has eight (8) students.

30. The average TMH classroom size in Hillsborough County is from eight (8) to

**1302**

ten (10) students, with a teacher, a teacher's aide, and an occasional DEES attendant or foster grandparent. The DEES attendants rotate from classroom to classroom. The foster grandparents spend approximately one-half day in the classroom as volunteers.

31. The majority of the TMH students at Manhattan Elementary are not toilet trained. The routine is for the diapers to be removed when the children arrive at school and for training pants to be used. There are several potty chairs in the classroom for use in toilet training. Each child's schedule of elimination is charted to facilitate the staff in putting the child on a potty chair near their "regular" elimination time. The staff are instructed to wear protective gloves when toileting the children.

32. In addition to the mental handicap, the children in the TMH class generally have physical problems, which include cerebral palsy, Down's syndrome, and fetal alcohol syndrome. The children are taught in close proximity to one another and the teacher for management purposes.

33. Plaintiff asserts that, if the Court does not find unrestricted access to the TMH classroom appropriate, certain reasonable accommodations could be made to facilitate the enrollment of Eliana in a TMH classroom and to minimize any danger by that enrollment. These suggestions include:

a. There is no need for Eliana to sit at the kidney-shaped table which is in the ambulatory TMH class; she can sit several feet away if necessary.

b. Eliana can have her own potty chair in the classroom.

c. There is no reason why Eliana could not be placed with non-ambulatory students, who are sometimes out of their wheelchairs, in any event, they are much less ambulatory than other TMH students.

d. If it is determined that a full-time aide is needed to be with Eliana at all times, that can easily be provided by the school. Such an arrangement is frequently provided for deaf/blind children

in special education. Such an aide could easily be trained in all of the precautions that are necessary in dealing with Eliana.

e. Use of pampers for toilet training rather than training pants.

f. Adequate supervision with at least three (3) people.

g. Limited classroom size of seven (7) to ten (10) children.

h. Use of gloves when changing diapers.

i. Prompt cleaning of soiled surfaces with disinfectant such as household bleach.

j. Disposing of waste material in a vinyl bag and placing clorox in the bag.

k. Recording the times of Eliana's eliminations.

34. Eliana Martinez does not suffer any restriction on her movements throughout the community at large at this time. She can go to the public beach, the public pool, the malls, or any other public or private building or place without restriction. The only restriction sought in this cause is the denial of access to the TMH classroom of the Manhattan Elementary School, due to her lack of toilet training and the "potential" for the spread of AIDS to the other children in that classroom.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this case; the cause of action is based on alleged violation of 20 U.S.C. §§ 1400 *et seq.;* Section 504 of the Rehabilitative Act of 1973, and the United States Constitution.

2. In any action brought pursuant to 20 U.S.C. § 1415(e)(2), the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

3. No party has an unlimited right to supplement the administrative record, but the court may allow the submission of additional evidence which it deems germane. *Town of Burlington v. Department of Education,* 736 F.2d 773 (1st Cir.

1984). The Court finds that all of the supplemental evidence submitted at the trial and by written submission are germane to the Court's decision as to the appropriate educational placement of Eliana Martinez. It is the duty of the Court to make an appropriate program decision for Plaintiff, based on the circumstances of the case as they exist at this time. *Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981).

4. The Rehabilitative Act of 1973 does not add to the rights available to Plaintiff under the EHCA. *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). As in that case, the claims under the constitution are identical to those under the EHCA and the legal and factual questions are thus the same. The *Smith* decision has been amended by Congress insofar as recovery of attorney's fees under the EHCA has been added to the statute. The Supreme Court's conclusions with respect to identity of relief available under the two statutes and the constitution are still valid. Therefore, this cause may be decided using the legal test developed under the EHCA.

5. Under the Education of All Handicapped Children Act (hereafter EHCA), 20 U.S.C. §§ 1400, *et seq.,* Plaintiff is entitled to a free, appropriate public education in the least restrictive appropriate environment.

6. The EHCA does not require the State provide services sufficient to maximize each child's potential "commensurate with the opportunity provided other children." *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. *Id.,* at 200, 102 S.Ct. at 3047–48.

7. The parties agree that the appropriate standard for placement of Eliana is a "free appropriate public education" in the "least restrictive environment" appropriate to the circumstances of the case. The parties, however, do not agree what the appro-priate least restrictive environment is in this case.

8. Plaintiff asserts that the appropriate placement is in a TMH classroom, without further modification. Plaintiff has proposed some restrictions to that access, if the Court does not agree to unrestricted access, such as placement in a non-ambulatory TMH class or provision for a full-time aide for Eliana; these are acceptable to Plaintiff in order to change Eliana's placement.

9. Defendant asserts, on the other hand, that the appropriate placement for Eliana remains homebound education, due to the facts that Eliana has AIDS, is not potty trained, and therefore poses a potential danger to the students of the TMH class which she desires to attend. Defendant additionally alleges that the EHCA does not require the School Board to provide one-on-one education within the context of the integrated classroom.

10. The homebound program which is now being provided to Eliana clearly deprives her of certain benefits of a classroom education, including socialization and modeling processes. The question the Court must address is whether or not other factors outweigh this clear deprivation of educational benefits so as to prevent the placement of Eliana in a TMH classroom.

11. The parties have offered the Court two divergent views on what is the most appropriate and least restrictive educational placement for Eliana Martinez: homebound education, and, placement in an integrated TMH classroom, with or without special accommodations. The Court believes the appropriate educational placement lies somewhere between these two positions.

12. The Court, once again, is faced with the challenge of making a medical judgment based on divergent medical testimony and opinion. The Court must balance the right of Eliana Martinez to get the most appropriate education available against the danger, if any, posed to the specific population, the TMH students, who will be exposed to Eliana. The children in this TMH

classroom are there because of their right to an appropriate and free public education and as required by the laws of the state for school attendance. As this Court said in *Ray v. The School District of DeSoto County*, 666 F.Supp. 1524, 1535, (M.D.Fla. 1987):

> The public at large has several interests to be considered here. First, is the concern of the public to provide adequate, non-discriminatory education to all the children of the state. The children of this state include children like the Ray boys, who, through no fault of their own, have contracted this disease; it clearly provokes in many, fear and a desperate desire to segregate them from mainstream life. However, there is an equally important public interest in protecting the health and safety of the public at large, and here, specifically, the school population which would be in contact with the Ray boys, if they are returned to an integrated classroom.

13. The Court's inquiry should focus on the following factors, based on reasonable medical judgment and the state of medical knowledge: the nature of the risk, the duration of the risk, the severity of the harm, and the probability of transmission which will cause varying degrees of harm. *See, School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

14. These factors have been addressed by this Court in the findings of fact. The severity of the harm if transmission occurs is clear, it is most likely fatal. At this time, the only time transmission would not be fatal is if the transmission resulted in seroconversion which never became symptomatic; otherwise, medical opinion is that all persons infected and symptomatic will die at some future time, perhaps as little as six (6) months from the onset of becoming symptomatic.

15. To the best of medical knowledge, at this time, the duration of the risk of transmission is perpetual; there is no evidence that transmissibility changes during the course of the disease.

16. The last two factors are essential to the consideration of this cause of action: the nature of the risk (How is the disease transmitted?) and the probabilities of transmission. AIDS has been proven to be transmitted in various ways: sexual intercourse, homosexual or heterosexual; intravenous drug use, sharing of needles and other equipment; perinatally; through breast milk; and through the transfusion of blood and blood products.

17. The virus has been isolated in other body secretions, including tears, saliva, and urine; but it has not been proven that transmission has occurred through any of these secretions. The possibility of transmission is generally conceded to be a "remote theoretical possibility." However, the CDC has not changed its recommendation that children without control of their bodily secretions might require a more restricted educational placement. It has added to its educational recommendations for schools, as of January 29, 1988, the statement that deep, open-mouthed kissing could theoretically transmit the HIV virus through the exposure of mucous membranes to infected blood and saliva.

18. Eliana Martinez is a neurologically handicapped child who has a case of AIDS, in the last stages of that disease, who is incontinent and who mouths her thumb and forefinger on a continuous basis. These bodily secretions, urine and saliva, have a remote possibility of being a route of transmission to the children of the TMH classroom that she desires to attend. For these reasons, the Court cannot find that the appropriate placement for Eliana is the totally unrestricted placement into the TMH classroom at Manhattan Elementary School; nor, or the other hand, can the Court agree that the proper placement for this child is in a homebound program. The Court finds that a restricted placement, as explained below, into the TMH classroom of Manhattan Elementary School is the appropriate least restrictive environment for Eliana Martinez, at this time, in the present circumstances.

19. As the Court noted earlier Eliana Martinez is free to enjoy the public and

private areas of this city, this county, and this country in other respects. The only concern of this Court, in this opinion, is to balance the factors in this cause and devise an appropriate, free educational placement for Eliana Martinez, in the least restricted appropriate educational setting. Accordingly, it is

ORDERED that Eliana Martinez be placed in the TMH classroom of Manhattan Elementary School under the following conditions, limitations, and restrictions, to be **strictly adhered** to by all parties and subject to the review of this Court:

1. The School Board of Hillsborough County, Florida, **shall** construct within the TMH classroom of Manhattan Elementary School, appropriate for the age of Eliana Martinez, a separate room which conforms to the directions of this Court:

   a. The room shall comprise at least five percent (5%) of the total square footage of the classroom; but shall be no less than six (6) feet by eight (8) feet in floor area.

   b. A wall of the room which faces the inside of the classroom shall have a door, which can be securely locked against intrusion, and, a large, picture window which provides a clear view of the main classroom from the inside. The window must start no more than two (2) feet from the floor and must comprise at least forty percent (40%) of the area of the wall. The wall need not extend to the ceiling; however, it must be high enough to prevent any child from scaling it to gain access to the other side.

   c. The room must contain an adequate sound system, so that if occupied with the door closed, the occupant can hear, as well as see through the window, everything that is occurring in the main classroom.

   d. The room must contain a door giving access to the outside corridor, without going through the main classroom.

   e. The room must contain a potty chair for use in toilet training concealed behind a partition, either sta-tionary or movable. Additionally, the room should contain appropriate work area, such as table and chair, for a child and an adult; appropriate books and toys; and any other necessary item of furniture or equipment.

   f. By the outside of the window, in the main classroom, there must be placed a low table on which the occupants of the main classroom can place objects and at which they can play within view of the occupant of the room.

2. The School Board of Hillsborough County shall provide a full-time aide to remain in the room with Eliana Martinez at all times while she is required to remain in the room. The aide shall be fully trained and educated in universal precautions for the handling of bodily secretions, and, dealing with Eliana Martinez and her disease.

3. The aide and teacher in the TMH classroom, as well as Eliana's family at home, will endeavor to toilet train Eliana and to teach the child not to mouth her fingers, as quickly as that can be accomplished.

4. Eliana Martinez is required to attend school in this constructed room as long as she remains incontinent and continues to mouth her fingers, despite instruction to the contrary. At the point, that the child becomes potty trained and is no longer mouthing her hand, she may be removed from the constructed room to be taught in the general classroom, assuming her parent and guardian is willing to absolve the School Board from any danger to Eliana from being in contact with the other children in the classroom.

5. During the time Eliana is being educated in the constructed room, a child may be allowed to enter the room and play with Eliana if a **written, knowing and voluntary** waiver is obtained from the parents of that child absolving the School Board from liability during this interaction within the constructed room.

6. Assuming that Eliana meets the criteria for moving into the main classroom, the School Board shall continue to provide a full-time aide to assist in the edu-

cation of Eliana Martinez in the integrated classroom, to maintain a reasonable separation of other children and Eliana in the classroom, and to assist in the control of accidental spillage of bodily fluids in the case of an emergency.

7. Eliana shall be restricted from being in the integrated classroom, after she is removed from the constructed room on a full-time basis, at anytime she has open sores or lesions, either on her body or in her mouth. If she is not kept at home, she may participate in the classroom activities at that time by once again spending the time in the constructed room.

8. If there is a question of the advisability of Eliana being in the classroom on a certain day, the school nurse should be consulted for an evaluation of either Eliana, or another child if the danger may be an infection from another child to Eliana. It is not necessary for Eliana, nor the rest of the THM students, to be seen by the nurse or other health practioner on a daily basis to determine if Eliana should be in the integrated classroom that day.